RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0096p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

13-5688

CRESTWOOD FARM BLOODSTOCK,

*Plaintiff-Appellee*,

*v.*

EVEREST STABLES, INC.,

*Defendant-Appellant*.

Nos. 13-5688/5689

13-5689

JEFFREY L. NIELSEN,

*Plaintiff*,

EVEREST STABLES, INC.,

*Plaintiff-Appellant*,

*v.*

LEWIS POPE MCLEAN, SR.; CRESTWOOD FARM
BLOODSTOCK, LLC; MCLEAN HOLDINGS, LLC;
CRESTWOOD FARM, LLC,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington
Nos. 5:09-cv-00317; 5:10-cv-00072—Karen K. Caldwell, Chief District Judge.

Argued: January 29, 2014

Decided and Filed: May 9, 2014

Before: SUTTON, McKEAGUE and WHITE, Circuit Judges.

1

---

**COUNSEL**

---

**ARGUED:** Thomas W. Pahl, FOLEY & MANSFIELD P.L.L.P., Minneapolis, Minnesota, for Appellant.  Adrian M. Mendiondo, KINKEAD & STILZ, PLLC, Lexington, Kentucky, for Appellees.  **ON BRIEF:** Thomas W. Pahl, Howard I. Wallach, FOLEY & MANSFIELD P.L.L.P., Minneapolis, Minnesota, for Appellant.  Adrian M. Mendiondo, D. Barry Stilz, KINKEAD & STILZ, PLLC, Lexington, Kentucky, for Appellees.

SUTTON, J., delivered the opinion of the court, in which McKEAGUE, J., joined, and WHITE, J., joined in part.  WHITE, J. (pp. 16–20), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

SUTTON, Circuit Judge.  In this breeders' quarrel between two thoroughbred horse operations—Everest Stables and Crestwood Farm Bloodstock—the parties dispute the terms of various arrangements between them to reproduce, care for and sell racehorses.  The district court granted summary judgment for Crestwood on its breach of contract claim and against Everest on its assortment of claims.  We affirm.

I.

When this dispute began, Jeffrey Nielsen owned Everest, a Minnesota corporation that breeds and races thoroughbreds, and Pope McLean, Sr., owned Crestwood, a thoroughbred farm in Kentucky's horse country.  The two businesses began working together in 1993, when Everest boarded several horses at Crestwood.  The relationship continued for fifteen years and included various boarding, breeding and selling arrangements.

One arrangement concerned an Everest horse named "Petionville," a stallion that had won the Louisiana Derby, the Ohio Derby and the La Jolla Handicap.  Crestwood agreed to board Petionville in 1996.  Consistent with a "protocol" letter written by Nielsen, the arrangement required Crestwood to contact Nielson with all requests for Petionville's breeding services, to supply information about the mare's "pedigree, race record, [etc.]," and not to sign

any breeding "contract . . . without [Nielsen's] approval." R. 152-6 at 1. The letter said little else.

The parties entered a more definite arrangement in November 2008, when Everest and Crestwood agreed to sell Everest's horses. According to the agreement, Everest would transfer ownership of more than 100 horses to Crestwood, Crestwood would take responsibility for the horses' day-to-day costs (including boarding, veterinary services and preparation for sale), and Crestwood would sell the horses at a public auction or in a private sale. The agreement added that the parties "shall sell" the subject horses, *e.g.*, R. 152-4 at 2, and prohibited Crestwood from setting a "reserve" on any horse—a price floor below which the seller refuses to go, *id.* at 3. The agreement allowed Crestwood to keep twenty-five to fifty percent of the proceeds from each horse's sale as payment for its services.

The agreement included more specific provisions about two horses: Island Fashion and its unnamed filly. As with the other horses in the agreement, Island Fashion and its filly would be boarded at Crestwood's farm. And as with the other horses, they would be sold at auction by Crestwood's agents. But in contrast to the other horses, they remained Everest's property. These were special horses in Nielsen's eyes—Island Fashion had won over $2 million—and Nielsen had high hopes in selling them.

Consistent with this arrangement, Crestwood tried to sell several Everest horses at auction, including the Island Fashion filly. Interested buyers placed two bids for the filly, one for $850,000, the other for $875,000. Everest wasn't satisfied. It planted a separate agent at the auction (without Crestwood's knowledge), who tried to drive the selling price higher by placing a $900,000 bid for the filly on Everest's behalf—a move that effectively set a reserve of at least $900,000 on the horse. In the absence of any non-Everest bids at or exceeding $900,000, the sale failed, and the auction house published the transaction as "R.N.A."—reserve not attained. After learning what Everest had done, Crestwood kept a portion of Everest's proceeds from selling other horses at the auction—$219,513.89, to be exact, which was twenty-five percent of the failed high bid for the filly (plus auction fees), what amounted to the commission Crestwood otherwise would have earned but for Everest's conduct.

Everest sued Crestwood in response, claiming that Crestwood breached a stable of contractual and other duties.  Crestwood counterclaimed, arguing that Everest breached the November 2008 contract and that Crestwood should be allowed to keep the disputed money. The district court granted summary judgment to Crestwood.  It denied Everest leave to file a fourth amended complaint.  And it saddled Everest with $272,486.30 in attorney's fees.

II.

Everest challenges the district court's rejection of several of its claims.  Each argument is unconvincing.

*Everest's breach of contract claim arising from an alleged management agreement.* Kentucky law, as the parties agree, governs this dispute.  Under Kentucky law, as under the law of other States, a contract must "contain definite and certain terms" to be enforceable.  *Kovacs v. Freeman*, 957 S.W.2d 251, 254 (Ky. 1997).  Invoking this principle, the district court determined that no agreement existed between Everest and Crestwood regarding Petionville's "management."  Crestwood might have offered Petionville a place to stay, but that does not mean it agreed to manage Petionville's retirement—advertising him, choosing breeding partners for him and the like.

A fresh look at the record supports the district court's decision.  The key document offered to support this claim—the "protocol" letter that Nielsen sent McLean in 1996—shows that Crestwood never agreed to manage Petionville's stud career.  Under the protocol, Everest retained final authority over Petionville's breeding partners, and Crestwood lacked authority to accept any breeding contract without Everest's approval. So far as the written record shows, Crestwood's only job was to forward breeding requests for Petionville to Nielsen for his review—hardly a management task.

In the alternative, Everest contends that it entered into an oral agreement with Crestwood to manage Petionville.  Yet even an oral contract, even one that we will assume for now would not violate the statute of frauds, must contain "clear and definite" terms.  In the absence of something concrete, no one could determine whether a party breached the agreement or how to measure damages. *Quadrille Bus. Sys. v. Kentucky Cattlemen's Assoc.*, 242 S.W.3d 359, 364 (Ky. Ct. App. 2007) (rejecting oral contract claim as a matter of law due to lack of "definite and

certain" terms).  Everest cannot meet that requirement on this record.  All that Everest has is the deposition testimony of Nielsen, who alleges that Crestwood agreed to "aggressively" market Petionville's breeding services.  R. 159-3 at 13.  The what, when, where and how of this marketing are never explained.  Nor does Everest show how all of this would create a management agreement.  Nielsen's hopes and Crestwood's puffery do not a definite and enforceable contract make.

Everest insists that Crestwood conceded the existence of a Petionville management contract.  Not so.  The cited statements concede nothing of the sort, and indeed say just the opposite.  One says that, "[d]espite standing PETIONVILLE at Crestwood, Everest did *not* enter any stallion management agreement with Crestwood."  R. 152-1 at 2 (emphasis added).  The other says that "*Nielsen* controlled all aspects of PETIONVILLE's management."  *Id.* at 15 (emphasis added).  Crestwood, true enough, admitted that it reached *some* agreement regarding Petionville.  Yet it was an agreement to provide "animal husbandry" services, including "stabling, grooming, veterinary care, and breeding administration," App'ee Br. at 26—tasks associated with boarding a horse, not managing it.

In the absence of evidence, written or oral, that Crestwood agreed to terms to manage Petionville, Everest alternatively submits that Crestwood *impliedly* agreed to manage the horse.  The first premise of Everest's argument is accurate:  Kentucky law recognizes implied contracts when the record shows "acts or circumstances which according to the ordinary course of dealing . . . show[] a mutual intent to contract."  *Rider v. Combs*, 256 S.W.2d 749, 749 (Ky. 1953).  The second premise is not:  No such evidence exists.  Everest and Crestwood acted according to the division of responsibilities described in the 1996 "protocol" letter:  Everest managed Petionville, and Crestwood boarded him.  Even Nielsen admitted that "Crestwood performed animal husbandry and cared for [his] horses while at the farm. . . . [and] had no part in [his] breeding decisions."  R. 152-11 at 3.  The district court correctly determined that no management contract existed, express or implied, written or oral.

In claiming that the implied contract claim should go to a jury, the dissent points to various "Stallion Service" agreements signed by McLean, a letter McLean sent to potential breeding partners for Petionville, and testimony from Nielsen about his conversations with

McLean.  *Post* at 16–20.  But as shown even implied contracts must have "definite and certain" terms to be enforceable, *Kovacs*, 957 S.W.2d at 254; *see Rider*, 256 S.W.2d at 750, and we see nothing in this evidence—or in the dissent—that tells us what these terms were, such as how long the "contract" lasted, how performance was measured and how compensation was set.  Nielsen's testimony illustrates the point.  When asked what "assurances" McLean made to him about Petionville, Nielsen said that "Crestwood . . . would work . . . very hard and extra hard and team up, and continue what they had been doing for the last several years and accelerate their efforts."  R. 152-5 at 18.  Neither this language nor the other evidence shows anything approaching a meeting of the minds between the stables—or more precisely a basis for a jury to find a meeting of the minds between them—about what the alleged obligation to manage Petionville entailed.

*Everest's breach of contract claim arising from the 2008 sales agreement.*  In claiming that Crestwood breached the November 2008 sales agreement, Everest had to present evidence of a breach and damages.  *Moore v. Phillip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993); *see also Miles v. Miller*, 75 Ky. (12 Bush) 134, 136 (1876).  It suffices to say, in reviewing this claim, that Everest has not shown damages.

The November 2008 agreement required Crestwood to sell horses "only to unaffiliated third parties."  R. 152-4 at 3.  Crestwood sold twenty horses for $20,000 to Don Ackel, and Everest maintains that Ackel had a horseracing partnership with McLean.  Assuming for the sake of argument that this established a breach, that does not mean Everest suffered damages from this public auction.  Nielsen wanted these twenty horses to be "immediately disposed of," R. 152-5 at 25, and the November agreement made Nielsen's desire explicit:  Crestwood was to "sell *or otherwise dispose of*" these horses, R. 152-4 at 3 (emphasis added).  Given that context, $20,000 for a score of horses that might have gone for nothing or, worse, been euthanized does not establish damages.  The record indeed includes testimony that Nielsen was "pleased" with this price at the time.  R. 152-10 at 9.

Everest isn't pleased now, it is true.  And the company claims it met this damages burden through Cecil Seaman, one of McLean's "consultant[s]," R. 181-2 at 8, who submitted a "report" estimating that the twenty horses sold to Ackel were worth close to $100,000 at the time of sale.

App. Br. at 46.  Crestwood moved to exclude Seaman's report, but the district court found no need to rule on the motion—and for ample reason.  Even on its own terms, the report does not create a material issue of fact regarding damages.  For one, Seaman's report is a "preliminary" appraisal of the horses sold to Ackel, R. 159-59 at 8, one never made final.  For another, the report never comes to grips with the terms of the November sales contract, which required Crestwood to sell or dispose of the horses quickly and prohibited Crestwood from setting a reserve on any horse.  For still another reason, the report never acknowledges the time frame in which Crestwood was asked to sell the horses promptly—November 2008—the midst of an economic crisis that surely affected the prices of stocks, houses and horses.

Seaman's appraisal methodology illustrates these problems.  To estimate a value for each horse, Seaman referred to the sales price for horses he considered "comparable" to those sold in bulk to Ackel.  R. 159-59 at 8.  But Seaman never explains how these horses were comparable.  Were they too designated for immediate sale or disposal?  Were they too sold in a setting in which the seller was prohibited from setting a reserve—a floor—on the sales prices of the horses?  In the absence of such information, Seaman's "comparable" sales offer no meaningful comparison.

Everest also appears to raise a distinct breach of contract claim, suggesting that Crestwood did not use "commercially reasonable efforts" to market and sell all of the horses.  App. Br. at 47.  Here too Everest has a damages problem.  And here too Everest relies on Seaman's expert report to overcome it.  The report refers to "Exhibit 9," which lists "reserve prices that should have been set for Everest's horses."  R. 159-59 at 8.  Exhibit 9 presumably shows a dollar-value difference between the recommended reserve for each horse and the horse's final sales price.  But we can only presume.  Exhibit 9 gives us just one half of the equation (each horse's suggested reserve price) without any clear indication of the other half (what each horse actually sold for)—which perhaps explains why neither party relied on the exhibit's valuations to show (or argue against) damages.  But even if the parties had relied on Exhibit 9 and even if the exhibit had contained comparisons along these lines, it would face another problem.  The whole premise of the argument is that Everest was damaged by Crestwood's failure to set reserves on

each horse's sale, yet the contract expressly prohibited Crestwood from setting any such reserves.

Even apart from this failing, we do not see how Crestwood breached its duty to act in a "commercially reasonable" manner. The only relevant evidence on this score comes from an industry expert who "personally observed" Crestwood's preparation of the horses for sale and concluded that "[t]he horses were in excellent condition and the protocol followed [by Crestwood] was standard and consistent with high quality consignments in Central Kentucky." R. 152-21 at 1. The same expert added that it was standard practice to "bundl[e] a group of low value horses for sale as a package," *id.* at 2, making the sale of twenty horses to Don Ackel for a flat fee customary rather than out of the ordinary. That satisfies the "commercially reasonable" standard.

Everest turn to "[c]ommon sense," suggesting that the unreasonableness of Crestwood's marketing efforts is obvious even to lay observers. App. Br. at 48. But the contract doesn't impose a "reasonable man" standard on Crestwood's sales activities; it requires "*commercially reasonable efforts,*" R. 152-4 at 3 (emphasis added), which means Crestwood promised to act "in good faith and in accordance with commonly accepted commercial practice," Black's Law Dictionary 263 (7th ed.). A lay person's common sense, even if it were properly characterized here (which is doubtful), cannot rebut the uncontradicted testimony of industry experts, who know a thing or two about what is "commonly accepted" and what isn't.

*Everest's breach of fiduciary duty claim.* In the absence of a breach of a written agreement, Everest seeks refuge in fiduciary duties. Fiduciary relationships "necessarily involve[] an undertaking in which a duty is created in one person to act primarily for another's benefit." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991). To find such a relationship, Everest must show that its "reliance [on the alleged fiduciary relationship] was not merely subjective." *In re Sallee*, 286 F.3d 878, 892 (6th Cir. 2002) (applying Kentucky law). The reliance must be reasonable, and "[o]nly in rare commercial cases is it reasonable to believe the other party will put your interests ahead of their own." *Id.*

This is not that rare case. The relationship between Everest and Crestwood instead looks like any other "ordinary business relationship" premised on a series of "arm's length

transactions." *Quadrille Bus. Sys.*, 242 S.W.3d at 365. Both Everest and Crestwood are for-profit businesses, and Everest duly compensated Crestwood for its services. Everest was represented by counsel and other advisors before entering into the November 2008 agreement at the center of this controversy, and that agreement makes clear that "Crestwood [would act] . . . for and on behalf of *both* Crestwood and Everest," R. 152-4 at 3 (emphasis added). Nielsen admitted in his deposition that the decision to split the proceeds from his horses' sale reflected a compromise between the needs of the two parties. All of this shows that the Everest-Crestwood relationship fell short of the fiduciary line.

Everest acknowledges it must demonstrate "extraordinary facts" to impose any fiduciary duties on Crestwood, App. Br. at 55, and claims it did so based on several allegations: Nielsen told McLean he was seriously ill and wanted to make sure his family was provided for; McLean had been Nielsen's "trusted advisor, agent and friend for 15-years"; and McLean "sold stud seasons" and collected stud fees on Everest's behalf, *id.* at 56. That the two were friends, even close friends, may well explain why they did business together. But that does not establish a fiduciary relationship—that Crestwood was charged with putting Everest's interests above its own. Many friends do business together. But not all friends are fiduciaries, and in the world of arms-length commercial negotiations few are. *See, e.g.*, *Sallee*, 286 F.3d at 891–92 ("[T]he fact that the relationship has been a cordial one, of long duration, [is not] evidence of a [fiduciary] relationship." (internal quotation marks omitted)); 90 C.J.S. Trusts § 197 ("The mere existence of mutual respect and confidence does not make a business relationship fiduciary.")

Everest's constructive trust theory doesn't make it out of the gate either. Nielsen claims that the court should find a constructive trust between the parties (premised on fiduciary duties), because McLean "took title to Everest's horses without payment to Everest, . . . taking advantage of Nielsen's illness and determination to protect his family." App. Br. at 57 (citing *Moore v. Terry*, 170 S.W.2d 29 (Ky. 1943)). But the facts don't support the claim. Nielsen negotiated the November 2008 agreement with the help of counsel, who wrote several drafts of the agreement. Both sides were well-positioned to protect their own interests.

*Everest's breach of agency duties claim.* Everest's agency-duty claim also fails. "Where a contract exists defining the scope of the principal-agent relationship . . . the existence and

extent of the agent's duties are determined by the agreement between the parties." *Monumental Life Ins. Co. v. Nationwide Retirement Solutions, Inc.*, 242 F. Supp. 2d 438, 449 (W.D. Ky. 2003) (applying Kentucky law); Restatement (Second) of Agency § 376.  Crestwood did not breach any agency duties created by the November 2008 sales agreement—for many of the reasons already given.  The sales agreement required Crestwood to "exercise all commercially reasonable efforts" to sell Everest's horses; it prohibited Crestwood from setting "reserve" prices on any horse; and it required Crestwood to keep title to any unsold subject horse "without additional consideration."  R. 152-4 at 3.  Crestwood met each requirement.

Everest maintains that Crestwood breached its agency duties, because it "failed to maximize the selling prices" of the horses at various auctions.  App. Br. at 53.  "McLean refused to discuss or set reserves" on horses, Everest adds, "despite the express orders and direction from Everest" to do so.  *Id.*  Had Crestwood set reserves on any of the horses, however, it *would* have breached the November agreement, which prohibited such reserve setting.  R. 152-4 at 3 ("Crestwood agrees and covenants that each horse shall be sold with no reserve.").  Adhering to this duty does not violate the contract in which it appears.

*Everest's unjust enrichment claim.*  Once it is established that Crestwood was not Everest's fiduciary, Everest's unjust enrichment claim falls by the wayside.  Everest demands an "accounting to determine the amount of money owed resulting from a breach of fiduciary duties," R. 204 (internal quotation marks omitted), but "to maintain an accounting, the claimant must have a . . . fiduciary relationship with [the] defendant . . . and an interest in the monies or property subject to the accounting."  *Gentry v. Coffey*, No. 2006-CA-002293-MR, 2007 WL 4465573, at *1 (Ky. Ct. App. Dec. 21, 2007).  Everest may well have the latter, but it has not shown the former.

*Everest's fraud claim.*  Also unavailing is Everest's fraud claim.  To establish fraud, a claimant must show that it reasonably relied on a representation that was material, false, known to be false or recklessly made, and made with the intent of inducing another to act or refrain from acting.  *See Ross v. Powell*, 206 S.W.3d 327, 330 (Ky. 2006).  A claim for fraud under Kentucky law also "must relate to an existing or past fact.  If the alleged misrepresentation relates to a

future promise or an opinion of a future event, then it is not actionable." *Radioshack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256, 262 (Ky. Ct. App. 2007) (citations omitted).

No fraud occurred. Everest bases its claim on Crestwood's promise to "increase [its] efforts to sell Petionville [breeding] seasons," App. Br. at 35—to "take Petionville to the next level," R. 204 at 20. Everest contends that Crestwood made these promises "with no present intention to actually perform" them. App. Br. at 35. But allegations of this ilk are not actionable. The statements sound more like "future promise[s] or . . . opinion[s] of a future event" than "false" representations of fact. *See Radioshack Corp*, 222 S.W.3d at 262. Even if Everest could overcome this obstacle, the evidence suggests nothing false about Crestwood's promise: Crestwood tried to market Petionville and "in no way hindered the horse's career." R. 152-22 at 3.

What about the drop in sales of Petionville's breeding seasons, Everest adds? Sales of Petionville's breeding seasons indeed dropped in 2006, falling eighty-five percent from the year before. But that statistic does not explain *why* the sales dropped. The only evidence in the record on that score comes from Crestwood's experts, who concluded that sales tanked because Petionville's offspring did poorly on the race track, not because Crestwood failed to market him. Said one: "By 2006 the market had determined that Petionville's advertised stud fee was unwarranted [given the race performance of his offspring] and demand for his services fell accordingly." R. 152-21 at 3. Said another: "Only a good top echelon stallion . . . will sire successful runners. Petionville . . . did not hit the mark . . . , a fact that was not within the control of [Crestwood]." R. 152-22 at 3.

## III.

Everest argues that the district court should have permitted it to file a fourth amended complaint. Leave to amend a complaint, it is true, should be "freely given when justice so requires." Fed. R. Civ. P. 15(a). Yet a court may deny leave on the basis of delay, bad faith, dilatory motive or futility. *See Forman v. Davis*, 371 U.S. 178, 182 (1962). We have no license to overturn the district court's decision unless it abused its discretion. *Prater v. Ohio Educ. Ass'n*, 505 F.3d 437, 445 (6th Cir. 2007).

No abuse of discretion occurred.  The court found undue delay because Everest moved for leave to amend more than two months *after* the court granted summary judgment to Crestwood and almost a year after the close of discovery.  "[A]ll key deadlines," in the court's words, "ha[d] long passed."  R. 233 at 2.  That was not all.  An "amendment at this late stage" of this case would have imposed "an unwarranted burden on the Court and place[d] an unfair burden on the opposing parties."  *Id.* at 1.  Finding "undue delay . . . and undue prejudice to the opponent in allowing amendment after the close of discovery," to say nothing of doing so in the context of a fourth amended complaint, is not an abuse of discretion.  *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999).

Everest claims that the court denied the motion because any amendment at that point would have been futile, a decision that gets fresh review.  That, however, is not the essence of what the district court did.  It denied the motion in the main because it was too late in coming, burdening both the court and the opposing party as a result.  "Futility" is mentioned in passing only at the end of the opinion, R. 233 at 3, which does not change this court's standard of review, *see Prater*, 505 F.3d at 445 ("Taken together, however, the retirees' delay, the late stage of the case when the motion was filed and the likely *futility* of any amendment show that the district court acted well within its *discretion*." (emphasis added)).

IV.

Everest also challenges the district court's decision to grant judgment as a matter of law to Crestwood on its breach of contract claim and to grant Crestwood's motion for attorney's fees.  Each argument fails.

*Crestwood's breach of contract claim.*  As with all contracts, the November 2008 purchase and sale agreement came with a "duty to do everything necessary to carry [the agreement] out."  *Ranier v. Mount Sterling Nat. Bank*, 812 S.W.2d 154, 156 (Ky. 1991).  This duty included an implied covenant of good faith and fair dealing.  Neither party, as a result, may act to "prevent[] the creation of the conditions under which . . . payment would be due."  *Odem Realty Co. v. Dyer*, 45 S.W.2d 838, 840 (Ky. 1932).

As the district court correctly held, Everest breached this covenant.  The agreement obliged Crestwood to sell Everest's horses, including the Island Fashion filly.  And this duty was

communicated through the language of obligation: "Crestwood *shall* consign for sale and *shall* offer for sale and *sell*" the subject horses. R. 152-4 at 3. "Shall means shall," *Vandertoll v. Kentucky*, 110 S.W.3d 789, 796 (Ky. 2003), and, once Crestwood met this obligation, payment (a percentage of the sales fee) became due. But Everest deliberately blocked the Island Fashion filly's sale. Not unlike a realty customer who in bad faith prevents his broker from finding a buyer (and from collecting a sales commission), *see Odem Realty Co.*, 45 S.W.2d at 839–40, Everest secretly bid on the filly and effectively set a reserve price that prevented a willing buyer from leaving with the horse and that kept Crestwood from collecting the fruits of its contract, a twenty-five percent cut.

How, Everest asks, could it have breached the agreement if nothing in it prevented Everest from setting a reserve price on the filly? True, while the agreement prohibited *Crestwood* from setting a reserve, the writing says nothing about Everest's obligations on this or any other score. But the point makes no difference. The agreement may not have been *explicit* about what Everest had to do under the contract, but an *implied* covenant of good faith and fair dealing never is.

Everest persists that the contract's merger clause means the court cannot look outside the four corners of the contract to find a breach. Because the contract says nothing about Everest's ability to set reserves, Everest argues, the district court erred by invoking extra-contractual obligations (like the covenant of good faith and fair dealing) to condemn Everest's reserve-setting behavior. This run-of-the-mill merger clause cannot bear the weight Everest places on it. The clause provides that "[t]his Agreement contains the entire agreement of the parties and any prior or concurrent written or oral understandings are deemed merged into this Agreement." R. 152-4 at 6. That is to say, neither party may use parol evidence to modify the contract's terms. That is not to say that the clause eliminates the implied good-faith obligations implicit in "*every*" contract on each party. *Ranier*, 812 S.W.2d at 156 (emphasis added).

Everest separately argues that language in the contract supports its right to set a reserve and scuttle the filly's sale. According to the agreement, "Crestwood shall consign for sale and shall offer for sale and sell at recognized 2009 Kentucky public auction sale(s), *as mutually agreed and determined between Everest and Crestwood*, [various] . . . thoroughbred weanling

horses." R. 152-4 at 3. As Everest reads this clause, it didn't "mutually agree" to sell the Island Fashion filly for $875,000, and it therefore retained the right to pull the horse from the auction ring. But this theory misreads the contract, as the district court correctly recognized. The last antecedent rule provides that "a limiting clause or phrase should ordinarily be read as modifying only the noun or phrase that it immediately follows." *United States v. Hayes*, 555 U.S. 415, 425 (2009) (internal quotation marks and alterations omitted). And here, "as mutually agreed" immediately follows "recognized 2009 Kentucky public auction sale(s)," meaning Crestwood and Everest agreed only to "mutually" decide *where* and *when* to sell the Island Fashion filly, not *whether* to sell the filly at all.

The agreement as a whole supports this reading. *See Fidelity & Cas. Co. of New York v. Cooper*, 126 S.W. 111, 113 (Ky. 1910) ("The language of the contract should be construed as a whole . . . . [T]he general purpose of the contract should not be defeated by a strained construction of particular words."). The clear purpose of the "PURCHASE AND *SALE* AGREEMENT" was to *sell* Everest's horses by various means: Some horses "shall" be sold at the Keenland auction in January 2009, R. 152-4 at 2; some horses "shall" be sold to private buyers, *id.* at 3; and some horses (including the Island Fashion filly) "shall" be sold at another "recognized" Kentucky auction, *id.* at 2–3. Crestwood and Everest agreed to sell the Island Fashion filly; the only question was which public auction the parties would choose for the filly's sale.

*Crestwood's motion for attorney's fees.* The November 2008 sales agreement includes a prevailing-party fee provision. "In the event of any action or proceeding to . . . enforce the terms of this Agreement," it says, "the prevailing party . . . shall be entitled to recover its . . . reasonable attorney's fees and other costs." R. 152-4 at 6. Consistent with this clause, the district court awarded $272,486.30 to Crestwood. Unless this award amounts to an abuse of discretion, we must respect it. *Singleton v. Smith*, 241 F.3d 534, 538 (6th Cir. 2001).

In reaching this figure, the court initially calculated Crestwood's "lodestar"— $340,607.90—the "proven number of hours reasonably expended on the case by an attorney, multiplied by a reasonable hourly rate." *Isabel v. City of Memphis*, 404 F.3d 404, 415 (6th Cir. 2005). It then reduced this amount by twenty percent because the contract provided fees not for

all claims but only for claims "enforc[ing] the terms" of the agreement. A few claims (Everest's fraud claim as an example) exceeded that scope. The resulting fee—$272,486.30—is reasonable in a case in which Everest sought more than $1 million in damages and raised multiple claims, ranging from breach of contract to breach of fiduciary duty to unjust enrichment. *See Graceland Fruit, Inc. v. KIC Chemicals, Inc.*, 320 F. App'x 323, 330 (6th Cir. 2008) (approving $400,000 award in case involving $800,000 in damages and multiple claims).

Everest does not challenge the $340,607.90 lodestar figure on appeal. It instead argues that the court's twenty percent reduction was unreasonable. The reduction was "arbitrary," Everest submits, because it was based on only "a few generalities about the case." App. Br. at 67. But Everest, it appears, is the one offering generalities. The district court found that Crestwood "clearly demonstrated how the remaining 80% of work relates to the November Agreement," and cited Crestwood's motion, which described in detail the rationale for the reduction. R. 234 at 8. Based on ample facts, to say nothing of the court's time-earned familiarity with the case, the district court reasonably found a twenty percent reduction appropriate. "The essential goal in shifting fees is to do rough justice," it is well to remember, "not to achieve auditing perfection." *Fox v. Vice*, 131 S. Ct. 2205, 2210 (2011). This award comes within this modest ambit.

V.

For these reasons, we affirm.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

HELENE N. WHITE, Circuit Judge (concurring in part, dissenting in part). I agree with the majority's determinations with two exceptions. I conclude that issues of fact precluded summary judgment on Everest's claims that Crestwood violated an implied contract to manage Petionville, and on both parties' claims that the other breached the 2008 purchase and sale agreement.

**Implied Contract to Manage Petionville**

Everest presented evidence that, beginning early on in the parties' relationship, Crestwood co-managed Petionville and his stallion career, and provided services for Petionville that went beyond animal husbandry. Nielsen testified that McLean undertook to market Petionville, and that he and McLean jointly set Petionville's stud fee, although the final decision was Nielsen's. PID 3005-06, 3007. McLean, Sr., acknowledged that he cancelled "a few" of Petionville's service contracts without contacting Nielsen, and that "there could have been a few" times he decided which mares were going to be bred to Petionville without consulting Nielsen. PID 3032-33. Everest produced numerous written "Stallion Service" agreements signed by McLean, not Nielsen, for Petionville breeding sessions. *See* PID 3307-08 (3/11/97), 3309-10 (3/20/98), 3312-13 (6/6/2000), 3314-15 (1/24/2001), 3316-17 (1/21/2002), 3349 (12/30/2002), 3347-48 (1/6/2003), 3318-19 (3/6/2003), 3320-21 (3/5/2004), 3302-03 (3/26/2004), 3322-23 (1/4/2005), 3324-25 (11/18/2005), 3326-27 (1/12/2007), 3328-29 (2/14/2008), 3330-31 (1/19/09) (sealed). Although Crestwood maintains that these agreements evidence simply that it administered the paperwork for breeding Petionville and not that it managed Petionville, a reasonable factfinder could conclude otherwise. Everest also submitted letters McLean sent breeders in January 2000 and January 2004, thanking them for their past support of Petionville and urging them to consider breeding mares to Petionville again. The 2004 letter stated:

Dear Breeder,

We would like to thank you for your past support of *Petionville*. Those of us that had the foresight to breed to *Petionville* initially, believing in his future stallion potential were right, and his success has become a reality!

*Petionville* has achieved some very impressive statistics from his first four crops. His name is continually found among the top leading sires' lists in various categories. His ability to sire a sound, fast, and precocious athlete is indicated by his 80% starters from foals, 67% winners from starters, and 26% 2-year old winners from starters. ***He sired an impressive seven stakes winners in 2003.*** Thus far his crowning achievement is ***Island Fashion***, winner of the ***Alabama Stakes* (G1)** at Saratoga, and the ***LaBrea* (G1)** at Santa Anita and has earnings of $1,112,970. His achievements are not based on a single championship caliber superstar, but an impressive roster of solid Graded stakes winners/horses and $100,000 + stakes winning earners as well! (see stallion page).

*Petionville* was an impressive dual ***Louisiana* (G2)** and ***Ohio Derby* (G2)** winner of over **$811,000**. *Petionville's* pedigree is equally impressive, being by champion sire-of-sires *Seeking the Gold*, a son of *Mr. Prospector*. Possibly his real genetic strength comes from his dam *Vana Turns* who produced ***Kentucky Oaks* (G1)** winner *Pike Place Dancer*.

As *Petionville* continues to climb the sire ranks, we invite you to consider *Petionville* again in 2004.

Sincerely,

Pope McLean

PID 3356 (dated 1/22/04) (italic and bold emphasis in original).

Nielsen also presented evidence supporting that Crestwood's efforts surrounding Petionville dropped off after Nielsen received a $ 6.5 million offer to purchase Petionville in February 2005. Nielsen discussed the offer with McLean, Sr., who discouraged him from accepting the offer, and thereafter did little to market Petionville, contrary to representations that Crestwood would take Petionville "to the next level":

Q. And what was the discussion with Mr. McLean?

A. He discouraged me from taking the offer . . . . He said that I would be leaving money on the table; that PETIONVILLE was right at the point where if he got to the next level, he would be worth millions more than the 6 and a half, and he told me that if Taylormade was interested at 6 and a half, that should tell me something; that they were very smart people and aggressive people and they were going to improve on the horse.

. . . .

Q. And you said certain assurances were given to you during that conversation?

A. Correct.

Q. What were those assurances?

A. Just an acknowledgement that I was going to be passing up a lot of money, and that – the extra effort to take that horse to the next level would be made by Crestwood; they would work . . . very hard and extra hard and team up, and continue what they had been doing for the last several years and accelerate their efforts.

. . . .

[A]fter I told [Pope McLean, Sr.,] that I was going to sell the horse, I think they only sold 18 seasons the rest of the year. I could be wrong on the amount, but it dropped significantly.

PID 2558, 2560. Nielsen also testified that McLean, Sr., had told him year after year that Crestwood had "a concentrated three person sales force," and that it was only during discovery in the instant case that he learned that was not the case. PID 2560.

Further, the letter the majority quotes[1] does not doom Everest's implied-contract claim. Maj. Op. at 5. Nielsen wrote Crestwood on July 31, 2009 regarding mare abortions and horse euthanasia. PID 2602-03. Crestwood's motion for summary judgment characterized Nielsen's letter as "summariz[ing] Crestwood's involvement with PETIONVILLE and [Nielsen's] general breeding operation" when, in fact, the letter makes no reference to Petionville or to Crestwood's duties regarding Petionville's management and promotion. The majority nonetheless relies on language in the letter's final two paragraphs, where Nielsen states that Crestwood on numerous occasions

took credit for my spotless reputation in the horse industry and also attributed my success as a national top ten breeder to Crestwood. Crestwood had minimal involvement in my breeding operation. . . . Crestwood performed animal husbandry and cared for my horses . . . However, Crestwood had no part in my breeding decisions, my genetic and/or catalogue mare selections, my selection of two year old trainers, and my race track and race horse management, and my ultimate earnings. The breeder owner ranking I achieved was based on race track monetary earnings. Crestwood had nothing to do with that.

---

[1]Crestwood's motion for summary judgment refers it as the "Animal Husbandry Letter." PID 2489-90.

*See* PID 2603.  This letter was written on the eve of this action being filed and while a possible settlement was being discussed, PID 3258 n.8, and is subject to varying interpretations.  The paragraph quoted above could be interpreted as an admission that Crestwood had minimal involvement in all of Everest's breeding operations, including Petionville's, or it could be interpreted otherwise, e.g., as referring to the fact that Crestwood had no hand in building Everest's reputation from the mid-1980s, when Everest entered the horse business, until the mid-1990s, when the parties entered into a relationship or, as Nielsen testified, as simply responding curtly to Crestwood's correspondence seeking credit for Everest's accomplishments.  PID 3258.

The majority's determination that Nielsen's "protocol" letter to Crestwood[2] shows that "Crestwood never agreed to manage Petionville's stud career" is a factual finding inappropriate at the summary-judgment stage.  The letter does not establish that Crestwood did not manage Petionville's stud career.  The letter states, in sum, that Nielsen will have the right to "approve" any stud contract for Petionville, implying that Crestwood was involved in managing Petionville's breeding contracts.  Nielsen testified that he wrote the 1996 "protocol" letter in an

> attempt to suggest to Pope [McLean] kind of **include me in the process** here. I'm interested in the mares.  I'm interested in who the clients are.  Interested in what they are saying about PETIONVILLE.  I mean literally . . . we were almost talking everyday [sic].  So there was [sic] dozens of times, hundreds of times that they wouldn't send me a pedigree like this [protocol letter] suggests and they would just call and say the mare is a stakes winner or the mare has been baron

---

[2]The "protocol letter" from Nielsen to Pope McLean, Sr., at Crestwood states:

> I believe we should establish a protocol for handling calls regarding seasons for "Petionville."
>
> All requests should be accompanied by Mare's pedigree, race record, produce and last year's breeding history (together with dates bred from the farm) and sent to me.
>
> I will respond within a very short time if the Mare will be satisfactory. Although I hope all Mares submitted will be fine, unfortunately a few may not be attractive, and I do not want to alienate or hurt anyone's feelings unnecessarily.  For this reason, a contract should not be approved or sent out without my approval.
>
> Best regards,
> EVEREST STABLES, INC.
> Jeffrey L. Nielsen

PID 2574.

[sic] four years in a row or something like that, and we would talk and make a decision on what to do.

PID 3002 (Nielsen dep. at 105, emphasis added).

Because these are issues of material fact, I would vacate the grant of summary judgment to Crestwood on Everest's implied contract claim.

## 2008 Agreement

The 2008 agreement clearly provides that Everest retained title to the Island Fashion filly until she sold. *See* PID 3457 ("the parties agree that Everest shall retain title and ownership to [Island Fashion and the 2008 Storm Cat/Island Fashion filly], from the Effective Date of this Agreement through the sale of said horses.") And, as the district court and the majority observe, the agreement is *silent* on whether Everest could set a reserve on the Island Fashion filly. PID 4451; Maj. Op. at 15 ¶ 41. Where a contract is ambiguous or silent on a vital matter, a court may consider parol and extrinsic evidence involving the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384 (Ky. App. 2002); *Dennis v. Watson*, 264 S.W.2d 858, 860 (Ky. App. 1953). Because the district court did not consider such evidence, I would vacate the grant of summary judgment to Crestwood on the question whether Everest breached the 2008 agreement by setting a reserve price on the Island Fashion Filly, and the award of damages to Crestwood. The majority's determination that Everest has not shown damages is premature.