NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0483n.06

**No. 13-1515**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

JOAN McCRAY,

      Plaintiff-Appellant,

v.

ANNIE CARTER; TERRY
CATCHINGS; MARVIS COFIELD;
JOYCE V. HAYES-GILES; OTIS
MATHIS, III; DAVID MURRAY;
CARLA D. SCOTT; IDA SHORT;
MARIE L. THORNTON; TYRONE
WINFREY; JIMMY WOMACK;
DETROIT BOARD OF EDUCATION,

      Defendants-Appellees.

**FILED**
Jul 03, 2014
DEBORAH S. HUNT, Clerk

**ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN**

---

**BEFORE:** **MERRITT, MOORE, and CLAY, Circuit Judges.**

**CLAY, Circuit Judge.** Plaintiff Joan McCray appeals the district court's grant of summary judgment in favor of Defendants, the Detroit Board of Education ("Board") and its members from 2007 to 2008, on Plaintiff's claim of retaliation in violation of Michigan's Whistleblowers' Protection Act ("WPA"), Mich. Comp. Laws § 15.362. For the reasons set forth below, we **AFFIRM** in part, **REVERSE** in part, and **REMAND**.

**BACKGROUND**

**I.** **FACTS**

Detroit Public Schools ("DPS") is the school district responsible for educating the city's children. The Board is DPS' elected governing body. During the time period relevant to this

suit, 2007 to 2008, DPS had about 16,000 employees, more than 200 schools, and an annual budget of approximately $1.2 billion. It also had more than its fair share of troubles. By the summer of 2007, the FBI had begun investigating misappropriations of federal funds by the head of DPS' risk management department. A 2005 bond issuance required DPS to produce a deficit elimination plan and issue monthly reports with detailed financial information. One Board member described DPS' predicament as "hell." (R. 60-3, Calloway Dep., at 1578.)

### A.      Calloway and Plaintiff Begin at DPS

It was in this climate that the Board hired Dr. Connie Calloway to be the Superintendent of DPS, beginning on July 1, 2007. Before she took over at DPS, Calloway was the Superintendent of a school district that covered areas outside of St. Louis, Missouri. Calloway recommended that Plaintiff, her Chief Financial Officer, accompany her to act as the CFO of DPS. DPS would be a change from Calloway's and Plaintiff's former jobs. Their former school district was much smaller than DPS—eight schools versus DPS' 200, with a much smaller budget. But competition for the job as DPS' CFO was not fierce. As Calloway testified, she "[c]ouldn't give the job away." (R. 60-3, Calloway Dep., at 1582.)

Plaintiff began her job at DPS on August 1, 2007. Her contract (which ran from July 1, 2007) only provided for six months of employment, with the ability for renewals with the consent of Plaintiff, the Superintendent, and the Board. In the end, Plaintiff's contract was renewed twice—in December 2007 and June 2008—for a total of three six-month terms ending on December 31, 2008. The Superintendent or the Board could terminate Plaintiff's contract without cause at any time. If Plaintiff was terminated without cause (as she eventually was), she would still receive all of the compensation due to her under the terminated contract. Plaintiff

could also be terminated with cause at the sole discretion of the Board, a route that would abolish all of Plaintiff's rights under the contract.

### B. DPS' Financial Straits

Almost immediately after starting as CFO, Plaintiff had to grapple with the serious budgetary issues that afflicted DPS. Plaintiff discovered that some vendors were billing DPS for services they did not actually perform. Plaintiff raised these instances of financial mismanagement with the Board in August or September of 2007. Dismayed by the chaotic financial situation in DPS, Calloway asked the Board to allow the Council of Great City Schools to perform an audit. The Board denied Calloway's request, but Calloway was able to obtain funding from an outside source. The audit went forward, although Plaintiff would have to wait until May 2008 for the results.

DPS' fiscal year begins on July 1. The budget-writing process usually begins in February and stretches through June, when the Board must adopt a budget. Under Michigan law, a school district "shall not adopt or operate under a deficit budget, and . . . shall not incur an operating deficit in a fund during a school fiscal year." Mich. Comp. Laws § 388.1702(1). In addition, a condition of DPS' 2005 debt issuance meant that if the district adopted or operated under a deficit budget, the State would appoint an emergency manager to administer the district's finances. These legal pressures made it even more important to balance the district's books.

As in any budget, DPS had to balance its expenses with its income. Walter Esaw, DPS' Executive Director of Budget, asserts that Plaintiff made missteps in both columns. One source of unexpected expenditures was something known as the "fallout account." As DPS prepared its budget, it would consider whether any teachers or other employees would be laid off before the next fiscal year. These employees were placed in a fallout account, effectively removing the cost

of their salaries from the next year's budget. All should go smoothly if these employees are in fact terminated before the next fiscal year. But if they are not, the cost of their salaries will not have been included in the annual budget. Plaintiff was on notice of the fallout account and its pitfalls as early as August 31, 2007, when she received an e-mail from Esaw containing the details of the fallout account and warning, "Remember there is a huge liability attached to these fallouts if not removed." (R. 58-5, Esaw Aff., at 1367.)

Esaw also claimed that Plaintiff mismanaged the revenue side of the DPS budget. A large portion of DPS' revenue depends on the number of students enrolled and attending school. Michigan determines the number of students by totaling those in attendance on "count days." But according to Esaw, Plaintiff and Calloway decided to budget based on enrollment projections. Apparently, these projections anticipated more students than actually showed up on count days, meaning that DPS would receive less revenue from the state than budgeted for.

For her part, Plaintiff asserts that one of the major problems with the DPS budget process was a failure to account for grant funding earmarked for special purposes. These grants can only be spent on specific projects, but the state's required reporting format apparently obscured the limited utility of these funds, making it appear that DPS had a much larger revenue pool than it in fact did.

### C.    Plaintiff's Reports to the Board

Whatever the reasons, Plaintiff repeatedly told the Board (Plaintiff had been appointed Board Treasurer in January 2008) that DPS was not operating at a deficit and would not have to adopt a deficit budget for the fiscal year beginning July 1, 2008. But Plaintiff reversed course in May 2008, when she received the final audit from the Council of Great City Schools. Plaintiff announced to the public that instead of running a surplus, DPS would face a budget deficit of

approximately $400 million. Plaintiff attributed the expected deficit to the fallout account. Plaintiff informed the Board of the impending deficit in June 2008. Calloway testified to the reaction that followed: Board members Joyce Hayes-Giles and Jimmy Womack "were terribly offended. Literally yelling, slamming the doors, 'I'm not going to have it. You are never going to declare a deficit budget. We will fire you and you.' Just every kind of threat there is." (R. 60-3, Calloway Dep., at 1606.) Calloway too was unhappy with this news. On June 16, 2008, she issued formal reprimands to both Plaintiff and Esaw for mishandling their financial responsibilities. Calloway cited Plaintiff for failing to identify and investigate problems surrounding the fallout account, and for not informing Calloway of the budget deficit. Calloway also cited Esaw for failing to report budget problems to her; although Esaw disputed Calloway's version of events.

Plaintiff ultimately presented the Board with two budgets in June 2008. The first was a one-year deficit budget; the other was a two-year budget that included a deficit-elimination plan. Both options had a serious implication for DPS. As a condition of the district's 2005 debt offering, adopting a deficit budget would trigger the appointment of an emergency manager to take over operations of DPS. Calloway testified that although the public responded well to Plaintiff's two-year deficit reduction plan, several Board members were livid: "the Board then just yielded [to the two-year plan], but said you'll be gone, we'll take care of it. . . . Deficit budget meant a trigger and there would be a state financial manager appointed. And I'm going to get you, you'll be gone before they get here." (R. 60-3, Calloway Dep., at 1630–31.)

### D. Plaintiff's Final Months at DPS

Plaintiff's relations with the Board did not improve. On July 17, 2008, Plaintiff was testifying at a Board Finance Committee meeting. Plaintiff refused to answer questions about

the district's finances, stating that she needed permission from Calloway before she could speak. Plaintiff also refused to accept a letter from the Michigan Department of Education that had been sent to a Board member—Calloway's procedures required such documents to reach DPS employees through more formal channels. Board member Jimmy Womack was not happy. He told Plaintiff that her refusal to answer questions was insubordinate, especially since she was the Board's Treasurer. Plaintiff responded, "Then I will be insubordinate." (R. 58-3, Womack Dep., at 1353.) Womack bluntly told Plaintiff that Calloway "needed to g-o and [Plaintiff] can g-o too." (*Id.*) Womack became so animated that Board member Tyrone Winfrey, who was chairing the meeting, had to take Womack outside and attempt to calm him down.

Plaintiff and other DPS officials at the meeting later wrote letters to Winfrey to complain about Womack's behavior; although Plaintiff seemed most upset that DPS employees were exposed to criticisms of Calloway. The same day that Winfrey received these letters, he wrote a memo to Carla Scott, the Board's Chair, and Joyce Hayes-Giles, the Board's Acting President, recommending that Plaintiff be removed from her position as Board Treasurer. Winfrey justified this recommendation by pointing to Plaintiff's failure to apprise the Board of the impending deficit until June 2008, and Plaintiff's behavior at the July 17, 2008 Board meeting. The Board removed Plaintiff as treasurer on August 14, 2008, and appointed Esaw as her temporary replacement.

The Board also took steps to remove Plaintiff from her position as CFO. On September 24, 2008, Calloway wrote Plaintiff a letter giving notice that the Board was considering non-renewal of her contract. The letter gave two reasons for this proposed action: reorganization within the district and economic necessity. The letter also informed Plaintiff that she had a week

to request a meeting with the Board to discuss the reasons for her proposed termination. Plaintiff did not request the meeting.

As the Board had predicted, in December 2008 the State of Michigan announced that an emergency manager would be appointed to run DPS. A week later, the Board voted 7-4 to terminate Plaintiff without cause effective immediately.

## II.    PROCEDURAL HISTORY

Plaintiff began this case in March 2009 by filing suit in the U.S. District Court for the Eastern District of Michigan. Plaintiff's complaint stated three causes of action: First Amendment retaliation; violation of the WPA; and a violation False Claims Act, 31 U.S.C. § 3730(h). After extensive discovery, Defendants moved for summary judgment on all counts. Plaintiff opposed this motion, and then filed her own motion to amend the complaint to allege a claim for breach of contract, based on the notice requirements for terminating certain school employees under Mich. Comp. Laws § 380.471a. The district court granted Defendant's motion for summary judgment in full and denied Plaintiff's motion for leave to amend. *McCray v. Carter*, No. 09-CV-10896, 2013 WL 1316759 (E.D. Mich. Mar. 29, 2013). Plaintiff timely appealed.

## DISCUSSION

Plaintiff has appealed the district court's grant of summary judgment as to Plaintiff's WPA claim, and the court's denial of her motion for leave to amend. She has not contested the district court's ruling on her First Amendment and False Claim Act claims, "and thus has waived review of them." *Moore v. Mitchell*, 708 F.3d 760, 774 (6th Cir. 2013). We address each of Plaintiff's claims on appeal in turn.

I.     **PORTIONS OF PLAINTIFF'S WPA CLAIM SHOULD HAVE SURVIVED SUMMARY JUDGMENT**

"The [Michigan] Legislature enacted the WPA in 1980 to provide protection to employees who report a violation or suspected violation of state, local, or federal law." *Henry v. Laborers' Local 1191*, --- N.W.2d ----, 495 Mich. 260, at *9 (2014) (quotation marks omitted). "The WPA furthers this objective by removing barriers that may interfere with employee efforts to report those violations or suspected violations, thus establishing a cause of action for an employee who has suffered an adverse employment action for reporting or being about to report a violation or suspected violation of the law." *Whitman v. City of Burton*, 831 N.W.2d 223, 229 (Mich. 2013) (footnote omitted).  Specifically, the WPA, as relevant to this case, prohibits an employer from "discharg[ing], threaten[ing], or otherwise discriminat[ing] against an employee . . . because the employee . . . reports or is about to report . . . a violation or a suspected violation of a law . . . to a public body." Mich. Comp. Laws § 15.362.

As in cases involving federal anti-retaliation statutes, a plaintiff may prove a violation of the WPA using either direct or circumstantial evidence of retaliation. *See Shaw v. Ecorse*, 770 N.W.2d 31, 40 (Mich. Ct. App. 2009) (per curiam).  Under the circumstantial route, a plaintiff opposing summary judgment must first establish a prima facie case "by showing that (1) the plaintiff was engaged in protected activity as defined by the act, (2) the defendant took an adverse employment action against the plaintiff, and (3) a causal connection exists between the protected activity and the adverse employment action." *Debano-Griffin v. Lake County*, 828 N.W.2d 634, 638 (Mich. 2013) (quotation marks omitted).  A defendant may then proffer evidence that the adverse employment action was motivated by legitimate reasons, after which a plaintiff must "raise a triable issue that the employer's proffered reason was . . . a pretext for unlawful retaliation." *Id.* at 639 (quotation marks and alteration omitted).  If a plaintiff goes the direct route, she must introduce evidence "which, if believed, requires the conclusion that the

plaintiff's protected activity was at least a motivating factor in the employer's actions." *Shaw*, 770 N.W.2d at 40.

## A.    Direct Evidence

Plaintiff asserts that she has offered direct evidence that her reports of financial shortfalls in June 2008 were a motivating factor of adverse employment actions taken against her. We agree.

First, Plaintiff engaged in protected activity when she reported to the Board in June 2008 that DPS had been operating in the red and would need to adopt a deficit budget for the 2008–2009 fiscal year. The Board is a "public body," as defined by the WPA. *See* Mich. Comp. Laws § 15.361(d)(iii). And in June 2008, Plaintiff reported a violation of state law to the Board. Under Michigan law, DPS "shall not adopt or operate under a deficit budget, and a district or intermediate district shall not incur an operating deficit in a fund during a school fiscal year." Mich. Comp. Laws § 388.1702(1). At the time Plaintiff made her reports to the Board, DPS had obviously not yet adopted a deficit budget. But, reading the facts in Plaintiff's favor, the deficit budget became a necessity because DPS had already been illegally operating at a deficit.

Next, Plaintiff has proffered evidence directly tying this protected activity to adverse actions. Calloway testified that when Plaintiff reported these financial problems, two Board members "were terribly offended. Literally yelling, slamming the doors, 'I'm not going to have it. You are never going to declare a deficit budget. We will fire you and you.' Just every kind of threat there is." (R. 60-3, Calloway Dep., at 1606.) These words were an explicit threat to Plaintiff's employment. They were made by "agent[s] of [Plaintiff's] employer," who themselves count as "employers" under the WPA. Mich. Comp. Laws § 15.361(b). Such threats from such sources, standing alone, violate the WPA. *See Phinney v. Perlmutter*, 564 N.W.2d

532, 555 (Mich. Ct. App. 1997), *overruled on other grounds by Garg v. Macomb County Cmty. Mental Health Servs.*, 696 N.W.2d 646 (Mich. 2005).

This evidence also supports Plaintiff's claim that her termination violated the WPA. The Board members who threatened Plaintiff when she informed them of DPS' financial difficulties later followed through and voted to terminate Plaintiff. If the Board had not voted to terminate Plaintiff, the record suggests that her contract would simply have been renewed. Calloway had recommended that Plaintiff's contract be extended and the State Department of Education had dubbed Plaintiff DPS' "key leader" and "nearly indispensable to [DPS'] long range effort." (R. 60-12, Radke Ltr., at p.4.) Yet the Board voted 7-4 to terminate Plaintiff without cause. If the two Board members who threatened to fire Plaintiff had voted the other way, Plaintiff would not have been fired, with the motion failing by a vote of 5-6.

Defendants suggest—without citing any Michigan or federal authority—that Plaintiff had to prove that a majority of the Board was motivated by retaliatory animus. We do not believe that Michigan courts would require this showing. A plaintiff can prevail on a WPA claim if she can show that "protected activity was a '*motivating factor*' for the employer's adverse action." *Debano-Griffin*, 828 N.W.2d at 639 (emphasis added). Plaintiff does not need to prove but-for causation.[1] Furthermore, in the analogous context of a First Amendment retaliation claim, our Circuit has held that "where improperly motivated [board] members supply the deciding margin

---

[1]The U.S. Supreme Court has recently clarified that a plaintiff must prove but-for causation to prevail in ADEA claims and Title VII retaliation claims. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009). Both of these statutes proscribe retaliating against someone "because" of that person's protected activity. 29 U.S.C. § 623(a) (ADEA); 42 U.S.C. § 2000e-3(a) (Title VII). Although the WPA contains the same "because" language, Mich. Comp. Laws § 15.362, we doubt that Michigan courts would upset this settled issue of state law based on the Supreme Court's pronouncements on two federal statutes. Indeed, Michigan courts have already rejected but-for causation in WPA claims for failure to promote. *See Hopkins v. City of Midland*, 404 N.W.2d 744, 752 (Mich. Ct. App. 1987).

[in a vote], the board itself is liable." *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 262 (6th Cir. 2006). The record shows that the two Board members who threatened to fire Plaintiff immediately after she reported a financial crisis in DPS later provided decisive votes to terminate her. This is sufficient for Plaintiff to survive summary judgment.

Finally, Defendants argue that Plaintiff was fired for an entirely valid reason—gross incompetence. But even if Defendants were motivated by this valid justification (and there is certainly support in the record for this position), Plaintiff is still entitled to go forward if she can "prove that the defendant's discriminatory animus was more likely than not a 'substantial' or 'motivating' factor in the decision." *Sniecinski v. Blue Cross & Blue Shield of Mich.*, 666 N.W.2d 186, 193 (Mich. 2003); *see also Shaw*, 770 N.W.2d at 40. Plaintiff has introduced evidence that two Board members explicitly threatened to fire Plaintiff immediately after she reported violations of Michigan law in June 2008. Those two Board members later cast decisive votes to terminate Plaintiff's employment with DPS. This evidence is enough for Plaintiff's claim to survive summary judgment.

### B. Circumstantial Evidence

Although we reverse the district court as to Plaintiff's claim based on her reports in June 2008, we affirm the district court's holding that Plaintiff has not established a prima facie case of retaliation based on the reports of financial mismanagement that she made to the Board in August and September of 2007. To establish the causation element of her prima facie claim, Plaintiff must "show that h[er] employer took adverse employment action *because of* [her] protected activity," not simply that she was terminated "*after* the protected activity occurred." *West v. Gen. Motors Corp.*, 665 N.W.2d 468, 472 (Mich. 2003) (per curiam). The year that passed between Plaintiff's protected activity and her termination is too long to support a causal

inference, and Plaintiff has not proffered evidence to bolster this element. We thus hold that the district court properly dismissed Plaintiff's WPA claim stemming from Plaintiff's reports in August and September 2007.

## II.    THE DENIAL OF PLAINTIFF'S MOTION FOR LEAVE TO AMEND WAS NOT AN ABUSE OF DISCRETION

Plaintiff next asserts that the district court erred when it denied her motion for leave to amend her complaint. We disagree.

A party may amend her complaint at any time before trial with the court's permission, and "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). But the court may deny leave to amend based on "undue delay, bad faith or dilatory motive on the part of the movant, . . . undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility," among other reasons. *Foman v. Davis*, 371 U.S. 178, 182 (1962). We have "required at least some significant showing of prejudice to deny a motion to amend based solely upon delay." *Prater v. Ohio Educ. Ass'n*, 505 F.3d 437, 445 (6th Cir. 2007) (quotation marks omitted). When the district court denies a motion for a reason other than futility, we review that decision for abuse of discretion. *See Crestwood Farm Bloodstock v. Everest Stables, Inc.*, 751 F.3d 434, 444 (6th Cir. 2014).

On May 16, 2011, more than two years after she initiated this lawsuit, Plaintiff sought to amend her complaint to allege a claim to breach of contract. Plaintiff did not assert that Defendants violated any term explicitly included in her employment contract, but rather that they violated a provision of Michigan law governing notice of non-renewal of DPS administrators' contracts. *See* Mich. Comp. Laws § 380.471a. Section 380.471a actually requires the Board to give administrators two notices. First, the Board must give the administrator "a written statement of the reasons the board is considering the nonrenewal" at least 30 days before the

Board issues the final notice of nonrenewal. Mich. Comp. Laws § 380.471a(3). Once the administrator receives this first notice, she can request a meeting with the Board to discuss the reasons for the proposed non-renewal. *See id.* Second, the Board must give the administrator a separate notice of non-renewal "at least 60 days before the termination date of the contract." Mich. Comp. Laws § 380.471a(2). If the Board does not follow these procedures, "the contract is renewed for an additional 1-year period." *Id.* Although Plaintiff concedes that she received a notice of non-renewal in September 2008, she asserts that this single notice cannot satisfy both requirements of § 380.471a.

The district court rejected Plaintiff's proposed amendment, holding that Plaintiff's motion was both untimely and would cause Defendants prejudice, as it came after the close of discovery. *See McCray*, 2013 WL 1316759, at \*18. This was not an abuse of discretion. At the moment Plaintiff was terminated, she knew (at least presumptively) the notice requirements of § 380.471a, and she knew what notices she had or had not received from the Board. Nonetheless, Plaintiff did not include this claim in her original complaint, and waited for more than two-and-a-half years before moving to amend. By that date, discovery had long since closed and motions for summary judgment were pending. The district court acted well within its discretion in denying Plaintiff's motion under these circumstances. *See Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999).

## CONCLUSION

For the reasons explained above, we **REVERSE** the district court's grant of summary judgment as to Plaintiff's WPA claim stemming from her reports to the Board in June 2008,

**AFFIRM** the district court in all other respects, and **REMAND** for further proceedings consistent with this opinion.[2]

---

[2]We add one final observation. This case is in federal court on the basis of federal question jurisdiction, with supplemental jurisdiction covering Plaintiff's WPA claim. *See* 28 U.S.C. § 1367. Plaintiff, however, has not appealed the dismissal of her federal claims, and those causes of actions will not go forward on remand. The district court continues to have supplemental jurisdiction over Plaintiff's WPA claim, *see Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1255 (6th Cir. 1996), but this state law claim entirely dominates the case at this point in proceedings. *See* 28 U.S.C. § 1367(c)(2), (3). The district court may wish to consider whether the courts of the State of Michigan are the more appropriate forum for this dispute, which involves significant issues of fact and law for the State and the City of Detroit. However, this choice lies entirely within the sound discretion of the district court.