NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name:  06a0052n.06
Filed:  January 18, 2006

No. 04-6435

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| D. MICHELLE BERGMAN, | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| BAPTIST HEALTHCARE SYSTEM, INC., | ) | WESTERN DISTRICT OF KENTUCKY |
| | ) | |
| **Defendant-Appellee** | ) | |

Before:  KENNEDY, Senior Circuit Judge and GIBBONS, Circuit Judge; DONALD, District Judge.[*]

**JULIA SMITH GIBBONS, Circuit Judge.**

D. Michelle Bergman alleges that she was terminated by her employer because of her pregnancy. She sued the employer, Baptist Healthcare System, Inc. ("BHS"), under Title VII of the Civil Rights Act of 1964 and the Kentucky Civil Rights Act (KCRA). Bergman also brought contract and quasi-contract claims. The district court granted summary judgment to BHS, and Bergman appealed. For the following reasons, we **AFFIRM** the district court's grant of summary judgment.

---

[*] The Honorable Bernice Bouie Donald, United States District Judge for the Western District of Tennessee, sitting by designation.

-1-

Western Baptist Hospital, a healthcare facility operated by BHS in Paducah, Kentucky, hired Bergman on February 4, 2002, as an infant teacher in its daycare center. Bergman was in charge of infants aged four- to six-months. Her job responsibilities consisted of feeding and changing the babies, as well as getting them to sleep and engaging in age-appropriate developmental activities with them. Bergman was an at-will employee.

Approximately two months into her employment at the daycare center, Bergman learned that she was pregnant with her second child. After she learned of her pregnancy, she informed her supervisor, Child Development Center Coordinator Pat Hayes, and Hayes congratulated her.

Bergman's pregnancy immediately was plagued by complications. Approximately two weeks after she discovered she was pregnant, on or around April 18, 2004, Bergman nearly miscarried. To prevent a miscarriage, Bergman's doctor ordered bed rest, which required Bergman to be absent from work for two weeks. Bergman provided a note from her doctor and informed Hayes that she would be absent. Hayes granted Bergman two-weeks leave.

Unfortunately, Hayes failed to comply with BHS's leave policy when she permitted Bergman to take two weeks off. Bergman was ineligible for BHS's Personal Leave of Absence (LOA).[1] A

---

[1] BHS grants employees leaves of absence for their serious health conditions as well as for their family members' serious health conditions. The family medical leave is granted pursuant to 29 U.S.C. §§ 2601-2619, and the eligibility requirements are set by the Family Medical Leave Act. The personal illness leave is granted pursuant to a BHS policy, and the sole eligibility requirement is employment with BHS for at least three months. Employees who have worked for BHS for three months can take up to three months of leave, but their jobs are not necessarily guaranteed for the duration of their leaves. Their jobs are guaranteed only until they exhaust their paid time off ("PTO") and accrued sick time. After the employees' PTO and sick time are depleted, they no longer have the right to return to their former positions.

LOA is available to BHS employees suffering from serious health conditions but only if BHS has employed them for at least three months. At the time Bergman needed the two-weeks-leave, she had not yet been a BHS employee for three months. Bergman's ineligibility was noticed by the human resources department. A member of the human resources department, Blanche Hensley, called Hayes to inquire about "what was going on with Michelle Bergman." After Hayes explained that Bergman had been ordered to bed for two weeks after a threatened miscarriage, Hensley asked Hayes, "[D]o you realize she's not eligible for family medical leave?" Because Bergman was ineligible for the leave she was taking, an employee in the human resources department called Bergman and informed her that she would lose her job if she did not return to work. Bergman "told [the employee that she] would return to work because [she] could not afford to lose [her] job."

Bergman immediately returned to work but with restrictions. Her doctor instructed her not to lift anything that weighed more than twenty pounds. Generally, BHS permits employees to work with restrictions for only thirty days and only if the restrictions can be accommodated in the workplace. Despite this policy, Hayes was willing to permit Bergman to work with the lifting restriction for the duration of her pregnancy. This was largely because the lifting restriction did not interfere with Bergman's job duties; her job as an infant teacher did not require her to lift many things that weighed more than twenty pounds. Nonetheless, Hayes did provide two accommodations for Bergman: she permitted Bergman to change diapers on mats on the floor to avoid lifting and to ask another teacher to lift the only baby in Bergman's care that weighed twenty pounds. Bergman worked with these accommodations from April 2004 until early August 2004.

In early August, Bergman went into labor, well in advance of her December due date. To

prevent a premature delivery, Bergman's doctor ordered a surgical procedure called a cervical closure to stop the dilation that already had begun. Bergman scheduled the surgery for August 8 and advised Hayes on August 6 or August 7 that she needed to take one week off from work to recover from the surgery and that after she recovered she could work only half-days on light-duty for the remainder of her pregnancy. Bergman interpreted light-duty as a total restriction on lifting, regardless of weight. Bergman never contacted the human resources department to take a LOA, and Hayes never recommended that she take a LOA instead of working part-time on light-duty.[2] Instead, Hayes and Bergman focused on accommodating the total lifting restriction, while keeping Bergman at work.

Initially, Hayes indicated to Bergman that the total lifting restriction could be accommodated by letting Bergman work as a "breaker" who relieved other teachers. After consideration and discussions with the Executive Director of Human Resources, Dick Thomas, and the Employee Health Nurse, Ann Croft, Hayes decided that Bergman's restriction could not be accommodated. Hayes concluded that she had no position, not even the breaker position, that required no lifting. Accordingly, Hayes decided to terminate Bergman and informed her of it on the morning of her surgery. Bergman recalls Hayes telling her that "Dick Thomas said that I could not work in the

[2] Even if Bergman had opted for a LOA and BHS had granted it, her job would not have been secure. Bergman only had 16.84 hours of accrued sick time and 17 hours of Paid Time Off ("PTO"), which would not have guaranteed her job even for the week she needed to recover from the cervical closure. Even construing these facts in the light most favorable to Bergman, BHS's failure to grant Bergman a LOA is not a distinct adverse employment action. Had she received the LOA she would have been subject to termination within a week. Not receiving a LOA that would have left her vulnerable to job loss cannot be characterized as an adverse employment action. Therefore, the district court did not need to analyze BHS's failure to grant Bergman a LOA as an adverse employment action.

breaker position and that I could no longer work there, that I would be a risk . . . . and they couldn't have that." Hayes encouraged Bergman to apply for another position at the daycare center when she could work restriction-free after giving birth.

After Hayes terminated Bergman, Bergman sued BHS for pregnancy discrimination, breach of contract, and promissory estoppel in Kentucky state court. BHS removed the case from state court to the United States District Court for the Western District of Kentucky. The district court granted summary judgment to BHS and dismissed all of Bergman's claims. Bergman moved to vacate the summary judgment, and the district court denied her motion, even though it acknowledged that it erred in its original analysis of her pregnancy discrimination claim. Notwithstanding, the district court concluded that the summary judgment need not be vacated because BHS was entitled to a judgment as a matter of law when the claims were properly analyzed. Bergman appealed the summary judgment to this court.

## II.

This court reviews the district court's grant of summary judgment *de novo,* reapplying the standard used by the district court to each of Bergman's claims. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Although all "inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion," *United States v. Diebold*, 369 U.S. 654, 655 (1962), summary judgment must be entered against the opposing party if she "fails to make

a showing sufficient to establish the existence of an element essential to . . . [her] case, and on which . . . [she] will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If "a reasonable jury could return a verdict for the nonmoving party" summary judgment should be denied. *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 248 (1986).

A. Pregnancy Discrimination Claim

"Title VII of the Civil Rights Act of 1964 prohibits employers from 'discharg[ing] any individual . . . because of such individual's . . . sex.'" *Turic v. Holland Hospitality, Inc.*, 85 F.3d 1211, 1213 (6th Cir. 1996) (quoting 42 U.S.C. § 2000e-2(a)(1)). The Pregnancy Discrimination Act ("PDA"), an amendment to Title VII, extended the prohibition on discharging employees "'on the basis of sex'" to firing women because of pregnancy. 42 U.S.C. § 2000e(k). The PDA requires employers to treat "women affected by pregnancy, childbirth, or related medical conditions . . . the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." *Id.*

Likewise, the KCRA prohibits employers from discharging an employee because of sex or pregnancy. Ky. Rev. Stat. Ann. § 344.040 (2003). In fact, "the Kentucky . . . statute is specially modeled after the Federal law." *Cf. Harker v. Fed. Land Bank*, 679 S.W.2d 226, 229 (Ky. 1984) (referring to the age discrimination provisions of the KCRA). Consequently, in interpreting the KCRA, "we must consider the way the Federal act has been interpreted." *Id.*

Under the KCRA and Title VII, an employee can demonstrate discrimination by her employer in one of three ways. She can proffer direct evidence of discrimination, present circumstantial evidence that permits an inference of discrimination, or show "that both legitimate

-6-

and illegitimate (discriminatory) reasons — in other words, 'mixed motives' — motivated the adverse employment decision." *Harris v. Giant Eagle, Inc.*, 133 F. App'x. 288, 296 (6th Cir. 2005); *see also Johnson v. Kroger Co.*, 319 F.3d 858, 864–65 (6th Cir. 2003) (identifying methods of proof for a Title VII claim premised on racial discrimination). Bergman attempts to prove her pregnancy discrimination claim by direct and circumstantial evidence; she makes no allegation that BHS was motivated by mixed-motives. Therefore, her claim will be evaluated under the direct and circumstantial analyses only, but by no method of proof could a reasonable jury return a verdict in Bergman's favor.

### 1. Direct Evidence

Employment discrimination is established by direct evidence when the employee comes forth with "evidence [that] requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). The discrimination is proven without resort to inference: that the employee was a victim of discrimination appears plain on the face of the evidence. *See Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004) ("Direct evidence is evidence that proves the existence of a fact without requiring any inferences."). After the employee comes forward with direct evidence of discrimination, "the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Bergman has presented no direct evidence of pregnancy discrimination. The only evidence

that connects her termination to her pregnancy is the time correlation between it and her firing and the ambiguous "risk" statement that Hayes attributed to Thomas. The mere fact that Bergman's termination coincided with her pregnancy does not prove pregnancy discrimination without resort to inference. The Thomas statement — that Bergman was a risk that they could not have — does not prove discrimination independently or even in tandem with the timing of her firing. Thomas might have been referring to risk to the children in the daycare center from being put in the care of a teacher who could not lift anything. Given this ambiguity, the risk statement cannot be construed as direct evidence of pregnancy discrimination.

2. Circumstantial Evidence

An employee proves employment discrimination through circumstantial evidence by creating a presumption of discrimination and challenging the employer to rebut the presumption by legitimating its employment action. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *McDonnell-Douglas* and *Burdine* set forth the "basic allocation of burdens and order of presentation of proof" for circumstantial evidence cases. *Burdine*, 450 U.S. at 252. The plaintiff must prove by a preponderance of the evidence a prima facie case of employment discrimination. *Id.* at 252-53. The nature of the alleged discrimination determines the elements of the prima facie case, *compare Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000) (setting out elements of a prima facie case of pregnancy discrimination)*, with Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004) (setting out elements of a prima facie case of gender discrimination), but the burden of establishing it is never "onerous." *Burdine*, 450 U.S. at 253. Once the employee has met its burden

of proving a prima facie case of discrimination, "the burden shifts to the [employer] 'to articulate some legitimate, nondiscriminatory reason for [its employment action].'" *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). If the employer carries its burden, the burden shifts back to the employee to prove that the articulated justifications for the employment action are merely pretexts for discrimination. *Id.* The employee can show pretext by demonstrating that the nondiscriminatory reasons offered for the employment action (1) have no basis in fact; (2) did not really motivate the employment action; or (3) were insufficient to justify the employment action. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff," *Burdine*, 450 U.S. at 253, despite "the division of intermediate evidentiary burdens." *Id.*

To make out a prima facie case of pregnancy discrimination, Bergman must show: "1) she was pregnant, 2) she was qualified for her job, 3) she was subjected to an adverse employment decision, and 4) there is a nexus between her pregnancy and the adverse employment decision." *Cline*, 206 F.3d at 658. Bergman has established the first three elements of her prima facie case. She was approximately five months pregnant when she was terminated, and, as the district court noted when it corrected its analytical error, she was qualified for her job as an infant teacher. The fourth element of the prima facie case requires Bergman to show, at a minimum, that Hayes knew Bergman was pregnant when making the decision to terminate her and that the termination was proximate to her pregnancy. *See DeBoer v. Murashi Auto Parts, Inc.*, 124 F.App'x. 387, 391 (6th Cir. 2005) (finding that temporal proximity satisfied nexus requirement); *Prebilich-Holland v. Gaylord*

*Entertertainment  Co.*, 297 F.3d 438, 443-44 (6th Cir. 2002) (finding employer's knowledge of pregnancy a requirement of the nexus element). Bergman has made this showing: Hayes knew Bergman was pregnant and was apprised of Bergman's pregnancy complications, and Hayes terminated Bergman while she was pregnant. Thus, Bergman has made out a prima facie case of pregnancy discrimination.

BHS, however, has carried its burden of rebutting the presumption of intentional discrimination. The legitimate, nondiscriminatory motive put forth by BHS is that the daycare center had no position that Bergman could fill while working half-days with a total restriction on lifting.

Because BHS indicated that it terminated Bergman because it could not accommodate her restriction, Bergman must expose this proffered justification as a pretext for pregnancy discrimination. To establish pretext, Bergman argues that BHS should have probed to determine precisely what work she could perform while under the light-duty restriction. Bergman cannot establish pretext by arguing that BHS should have investigated her restriction when *she* interpreted the restriction for Hayes and indicated that it prohibited her from lifting anything. BHS can rely on Bergman's own interpretation of her doctor's instructions. But even if BHS should have determined independently the amount of work that Bergman could perform, that does not indicate that BHS's justification for terminating her was pretextual. It does not demonstrate that Bergman in fact could have performed some job at the daycare center, that BHS really acted on the ulterior motive of discriminating against her, or that BHS's belief that the daycare center had no job that Bergman could perform was insufficient to justify terminating her. *See Manzer*, 29 F.3d at 1084 (holding that the employee can establish pretext only by showing that the employer's proferred non-

-10-

discriminatory reason for the termination had no basis in fact, did not motivate the termination, or was insufficient to justify the termination).

Likewise, Bergman's observation that other employees were permitted to work part-time, with restrictions, or take extended LOA's does not establish pretext. This observation does not go to the issue of whether BHS could accommodate Bergman's particular restriction in the daycare center. The employees Bergman identified worked throughout the hospital and had restrictions that permitted them to work different amounts under different circumstances. No employee Bergman identified worked in the daycare center and was restricted to working half-days without lifting for four months. The one daycare center employee who had a total lifting restriction presumably could work full-time and only was prohibited from lifting for one month. Therefore, her restriction was much less difficult to accommodate than Bergman's. Consequently, BHS's accommodation of her restriction does not imply that its reason for terminating Bergman was pretextual. More significantly, however, BHS's prior accommodation of Bergman's twenty-pound-lifting restriction suggests that BHS accommodated Bergman to the greatest extent possible and only terminated her when it reached the limit of its accommodations.

## B. Contract Claim

Bergman cannot establish that BHS breached an employment contract because she was an at-will employee. She signed a statement acknowledging that she had no employment contract with BHS when she received her employee handbook. *See Shah v. Am. Synthetic Rubber Corp.*, 655 S.W.2d 489, 492 (Ky. 1983) (presuming that an employee is terminable at will unless the employer and employee expressly agreed that the employee could be terminated only for cause); *see also*

-11-

*Williams v. Webster County Coal*, 2003 WL 1240474, \*2 (Ky. App. Feb. 7, 2003) (requiring a "clear expression of the parties' intent to abandon the at will employment relationship"). She was never converted to a contract employee because neither she nor BHS expressed a clear, explicit intent to alter the employment relationship. *See Shah*, 655 S.W.2d at 492 ("If it is their purpose, the parties may enter into a contract for permanent employment—not terminable except pursuant to its express terms—by stating clearly their intention to do so . . . ."). Hayes's initial indication that Bergman could work as a "breaker" does not constitute a clear, express intent to transform Bergman from an at-will employee to one terminable only for cause. Given that Bergman was at all times an at-will employee, she cannot maintain an action for breach of employment contract.

C. Quasi-Contract Claim

Bergman cannot make out the elements of a quasi-contract claim even though the doctrine of promissory estoppel applies in the employment context. *McCarthy v. Louisville Cartage Co.*, 796 S.W.2d 10, 12 (Ky. Ct. App. 1990). Promissory estoppel requires: "(1) a promise; (2) which the promisor should reasonably expect to induce action or forbearance on the part of the promissee; (3) which does induce such action or forbearance; and (4) injustice can be avoided only by enforcement of the promise." *See Res-Care, Inc. v. Omega Healthcare Investors, Inc.*, 187 F. Supp. 2d 714, 718 (W.D. Ky. 2001) (citing *Meade Const. Co. v. Mansfield Commercial Elec.*, 579 S.W.2d 105, 106 (Ky. 1979)). The only statement made on behalf of BHS that could be construed as a promise was Hayes's indication that Bergman could work as a "breaker." Even if this statement was a promise, Bergman cannot establish the other elements of promissory estoppel. She did not act in reliance on Hayes's "promise" that she could be a "breaker" — she would have had the surgery necessary to

-12-

save her pregnancy regardless. In fact, she had scheduled the surgery before Hayes's alleged "promise." Therefore, as a matter of law, Bergman's quasi-contract claim fails.

## III.

For the foregoing reasons, the district court's grant of summary judgment to BHS is **AFFIRMED**.