NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0566n.06

Nos. 20-6059/6090

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>SALLY HALL,<br><br>    Plaintiff-Appellant/Cross-Appellee,<br><br>v.<br><br>RAG-O-RAMA, LLC,<br><br>    Defendant-Appellee/Cross-Appellant.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>FILED<br>Dec 07, 2021<br>DEBORAH S. HUNT, Clerk<br><br>ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY<br><br>AMENDED OPINION</td></tr>
</table>

Before: BOGGS, GRIFFIN, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. This case shows that a contract's bad grammar does not necessarily render it ambiguous. Sally Hall sued her former employer, Rag-O-Rama, LLC, when it fired her less than a year after promoting her to an area-manager position. A poorly drafted sentence in the parties' employment contract stated: Hall "is reminded of the non-competition clause guidelines, as well as, obligating associate managers and higher to one full year of employment on the management team at Rag-O-Rama." This sentence has an obvious grammar mistake. Hall says that a reasonable person might understand it as requiring *Rag-O-Rama* to retain her for a year. In context, however, the sentence plainly obligated managers like *Hall* to stay for the year. It did not require Rag-O-Rama to do anything and so did not depart from Kentucky's default rule allowing the company to fire Hall at any time. Maybe so, Hall responds, but Rag-O-Rama also fraudulently induced her to take this job with additional oral promises it did not keep.

Yet Hall could not have reasonably relied on those oral promises because they conflicted with the parties' written contract. The district court thus correctly rejected Hall's breach-of-contract and fraud claims. That said, Hall's position was not frivolous. So the district court did not abuse its discretion by declining to award attorney's fees to Rag-O-Rama. In short, we affirm that court across the board.

I

Rag-O-Rama buys used clothes from individual customers and resells them to other customers. Hall first learned of this company from a childhood friend, Vance Whitener. In 1999, Whitener convinced her to work for Rag-O-Rama. Hall claimed that she did "just about everything" for the company, ranging from writing its training manuals, to designing its slogans, to managing its St. Louis and Columbus stores. Hall Dep., R.52, PageID 301, 305. Yet she "walked away" from Rag-O-Rama in 2003 because Whitener had made her "position extremely uncomfortable." *Id.*, PageID 303.

Following her job with Rag-O-Rama, Hall eventually became the director of operations for Elizabeth Cole Jewelry, a company that makes and sells jewelry. She started working for Elizabeth Cole from her San Francisco home and kept working for it after she moved to her present home in Kentucky.

Throughout this time, Whitener remained at Rag-O-Rama. He ultimately became its president and sole owner. In 2015, Hall claims that Whitener pleaded with her to return to Rag-O-Rama because of his health problems and the business's lagging fortunes. (Whitener alleges that Hall begged him for the job, but we must accept Hall's version of the facts at this stage. *See Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 210 (6th Cir. 2019).) Hall and Whitener agreed that she would become a part-time trainer who would help the staff at Rag-O-Rama's Columbus

store beginning on August 21, 2015. Rag-O-Rama agreed to pay Hall an $18,000 annual salary. She could continue to live in Kentucky and keep her other job with Elizabeth Cole.

After a few months, Hall asserts, Whitener was "extremely pleased" with her work and tried to convince her to take a full-time job. Resp., R.64-1, PageID 759–60. To persuade Hall to quit Elizabeth Cole, Whitener allegedly offered several enticing terms. He suggested that Hall could have a company car, $5,000 for her prior creation of the company's slogan ("Recycle Your Wardrobe"), and an opportunity to oversee a franchising division that could lead to Hall becoming a part-owner. (Whitener denies promising these things.)

Swayed by Whitener's promises, Hall left Elizabeth Cole and accepted a full-time job as an area manager at Rag-O-Rama. Her new role, which came with a large pay increase to $51,000, began on June 13, 2016. Because she took a risk by leaving a long-term job, Hall claims that she insisted on an employment contract with Rag-O-Rama that would guarantee one year's salary and benefits. Hall and Whitener ultimately signed a document entitled "Communication Form" that listed her job title and employment terms. A noncompete paragraph suggested that Hall was "obligating" herself "to one full year of employment on the management team at Rag-O-Rama" and agreeing not to join a competitor for two years after her employment ended. Commc'n Form, R.52-1, PageID 487. Another paragraph explained that Hall had reviewed the Employee Handbook and agreed to "uphold" its policies. *Id.* This handbook clarified that Rag-O-Rama hired all individuals as "at will" employees whom it could fire at any time. The Communication Form did not expressly include any of Whitener's alleged oral promises to Hall.

When Rag-O-Rama hired Hall, it identified a list of problems for her to address at the Columbus store, which had been missing its sales targets. Within months of Hall's transition to area manager, Whitener reviewed her performance. He noted some positive developments, but

also identified several areas of concern. Among other things, he suggested that Hall seemed to have kept to her part-time schedule, that employees had trouble reaching her because her phone regularly cut out, that she had difficulties running the store remotely from Kentucky, and that the store's sales continued to lag.

These problems persisted. On January 10, 2017, Whitener sent Hall a personal improvement plan and final warning. He identified similar issues with Hall's performance, including the difficulties reaching her and her apparent inability to run the store remotely. Hall refused to sign the document, claiming that Whitener was lying about her performance to set the stage for her firing. The same day, Rag-O-Rama disabled Hall's company email and cell phone and fired her.

Hall brought this diversity suit against Rag-O-Rama. The district court interpreted her complaint to plead many claims, including breach of contract and fraud. In an exhaustive opinion, the court examined and dismissed all but Hall's fraud claims. *Hall v. Rag-O-Rama, LLC*, 2020 WL 2134121, at *6–23 (E.D. Ky. May 5, 2020). When reviewing her breach-of-contract claim, the court found that the Communication Form constituted a contract. *Id.* at *6–7. Yet it also held that Rag-O-Rama's termination of Hall did not breach this contract because she remained an at-will employee. *Id.* at *8–10.

Turning to Hall's fraud claims, the court recognized that she alleged that Rag-O-Rama had induced her to quit her prior job based on several unmet oral promises, including job security, a company car, $5,000 for the prior design work, and a potential ownership interest. *Id.* at *16. The court found that Hall could not have reasonably relied on any job-security promise because she signed a contract making her an at-will employee. *Id.* at *18. It then found a dispute of fact on the other promises. *Id.* at *19. After Rag-O-Rama renewed its summary-judgment motion, the

court recognized that its logic on the job-security promise applied to the other promises. Because these promises did not make their way into the parties' contract, the court held, Hall could not have reasonably relied on them when quitting Elizabeth Cole. *Hall v. Rag-O-Rama, LLC*, 2020 WL 4741911, at *3–4 (E.D. Ky. Aug. 14, 2020). The court thus granted a final judgment for Rag-O-Rama.

Rag-O-Rama asked the district court to order Hall to pay its attorney's fees, describing her suit as frivolous. The court denied this motion. *Id.* at *5–6. It held that Hall's claims, even though lacking merit, were not so frivolous as to warrant sanctions. *Id.*

## II. Hall's Appeal

Hall appeals the district court's rejection of her breach-of-contract and fraud claims. We review its grant of summary judgment de novo. *See Bisig*, 940 F.3d at 210.

### A. Breach of Contract

The parties agree on three legal issues important to Hall's contract claim. They agree that Kentucky contract law applies even though Hall supervised an Ohio store, so we need not resolve any choice-of-law issues. *Cf. AtriCure, Inc. v. Meng*, 12 F.4th 516, 525 (6th Cir. 2021). They likewise agree that the "Communication Form" counts as an enforceable contract, so we need not decide any contract-formation issues. And they agree on Kentucky's rules of the road for interpreting this contract. If the contract contains unambiguous text, we must enforce it as written without reliance on outside-the-contract ("parol") evidence. *See Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 783–84 (Ky. 2017); *New Life Cleaners v. Tuttle*, 292 S.W.3d 318, 322–23 (Ky. Ct. App. 2009). If, however, the contract contains ambiguous text that a reasonable person could interpret in different ways, we may rely on parol evidence to

determine the parties' understanding of what the text means. *See Superior Steel*, 540 S.W.3d at 783–84; *New Life Cleaners*, 292 S.W.3d at 322.

The parties disagree only over how these basic contract-law rules apply to the contract at issue in this case. Hall argues that a reasonable person could read the Communication Form as guaranteeing her a one-year term of employment. Rag-O-Rama responds that the Communication Form unambiguously allowed it to fire her at any time. We agree with Rag-O-Rama.

To begin with, Kentucky's background contract-law rules make Rag-O-Rama's reading the immediate favorite. Like most states, Kentucky starts with the presumption that an employer and an employee intend for an "at-will" relationship, meaning that the employer generally can fire the employee at any time for almost any reason and the employee can quit at any time for any reason. *See Wymer v. JH Props., Inc.*, 50 S.W.3d 195, 198 (Ky. 2001); *Bergman v. Baptist Healthcare Sys., Inc.*, 167 F. App'x 441, 447–48 (6th Cir. 2006). This presumption of at-will employment sets a clear rule for courts to follow when considering employment relationships that do not include a contractual term governing the length of the parties' association or the reasons why they may end it. *See Shah v. Am. Synthetic Rubber Corp.*, 655 S.W.2d 489, 491 (Ky. 1983); Richard A. Epstein, *In Defense of the Contract at Will*, 51 U. Chi. L. Rev. 947, 951–52 (1984). Courts will simply infer an implied "at-will" term. *See Crosby v. Univ. of Ky.*, 863 F.3d 545, 553 (6th Cir. 2017). Under this law, then, if the Communication Form says nothing about the length of Hall's employment or the reasons why Rag-O-Rama could fire her, she must lose.

That said, at-will employment is only a default rule. The parties may freely contract around this rule by including terms in an employment contract that establish a fixed employment period or permit a discharge only for specific reasons (such as misconduct). *See Shah*, 655 S.W.2d at 491–92. At the same time, Kentucky courts will not read ambiguous contracts as departing from

an at-will relationship. Rather, an employer and employee must "clearly stat[e] their intention" to follow a different framework. *Id.* at 492; *see, e.g.*, *Hall v. Consol of Ky., Inc.*, 162 F. App'x 587, 591–92 (6th Cir. 2006); *Jackson v. JB Hunt Transp., Inc.*, 384 S.W.3d 177, 184 (Ky. Ct. App. 2012); *Williams v. Webster Cnty. Coal*, 2003 WL 1240474, at *2 (Ky. Ct. App. Feb. 7, 2003).

To prove that the Communication Form guaranteed her one year of employment, then, Hall must point to language that "clearly" departs from Kentucky's at-will default rule. *Consol of Ky.*, 162 F. App'x at 591. She argues that the Communication Form's noncompete paragraph offers the clear evidence that she needs. It provides in full:

> He/she is reminded of the non-competition clause guidelines, as well as, obligating associate managers and higher to one full year of employment on the management team at Rag-O-Rama. If the one full year is not met, any benefit, including but not limited to used [paid time off], will be reversed/paid back to Rag-O-Rama. If a manager separates from the company, they are prohibited from working for a direct competitor for two years.

Commc'n Form, R.52-1, PageID 487. Hall reads the last clause in the first sentence—which refers to "one full year of employment"—as an unambiguous limit on Rag-O-Rama's ability to fire her.

Her reading is unambiguously mistaken. To be sure, this clause contains awful grammar. It says that Hall "is reminded of . . . obligating" managers "to one full year of employment[.]" The present participle "obligating" likely should have been a noun ("the obligation of"). But grammar errors do not automatically render a contract ambiguous if it has a clear meaning despite those errors. *See* 11 Williston on Contracts § 32:9 (4th ed.), Westlaw (database updated May 2021).

That is the case here. No reasonable person could read this clause as prohibiting Rag-O-Rama from terminating Hall for one year after she became an area manager. *See Superior Steel*, 540 S.W.3d at 783–84. The operative word ("obligating") conveys that this clause imposes a duty on someone to do something. *See Black's Law Dictionary* 1241 (10th ed. 2014); *American Heritage Dictionary of the English Language* 1215 (5th ed. 2011). That understanding raises two

questions: Who incurs the duty?  And what does it entail?  The rest of the clause answers both questions.  The word's object ("associate managers and higher") makes clear that the clause imposes a duty on managers such as Hall.  The clause's last part shows what the duty is: "one full year of employment."  The provision thus speaks in terms of a duty on Hall to work for a year; it requires nothing of Rag-O-Rama.  For the clause to guarantee Hall a year of employment, "obligating" would have to mean "entitling."  But the word cannot bear that construction.

The broader context confirms this understanding.  *See Shah*, 655 S.W.2d at 490.  The next sentence imposes a penalty on Hall if she violates the clause by working less than a year: she must return any paid benefits.  The provision, by contrast, identifies no penalty for Rag-O-Rama, confirming that it does not impose a duty on the company.  The clause also sits in a paragraph that imposes requirements only on Hall.  Besides the mandate to work a year for Rag-O-Rama, it bars Hall from working for a competitor for two years.  Nothing in this paragraph requires Rag-O-Rama to do anything.  More generally, the Communication Form acknowledges that Hall reviewed the Employee Handbook and agreed to "uphold" it.  Commc'n Form, R.52-1, PageID 487.  This handbook reiterated that employees work on an at-will basis.  *Cf. Consol of Ky.*, 162 F. App'x at 591–92.  In sum, both the clause on which Hall relies and the contract as a whole show that Hall did not have a guaranteed one-year term of employment.  At the least, Rag-O-Rama did not "clearly" consent to a departure from Kentucky's default rule of at-will employment.  *Id.* at 591.

Hall's efforts to find ambiguity do not persuade us otherwise.  She argues that a reasonable person could read the noncompete paragraph as imposing a noncompetition duty on her *in exchange for* a duty on Rag-O-Rama to give her one year's worth of employment.  She fails to explain how a reasonable reader could uncover this meaning in the clause.  Although she correctly notes that the clause is "poorly drafted," its deficient draftsmanship does not render it susceptible

to her preferred interpretation. Appellant's Br. 23; *see Superior Steel*, 540 S.W.3d at 783–84. As we have explained, Rag-O-Rama does not appear anywhere in this clause, it refers to managers after the key word "obligating," and it identifies the penalty for those managers if they violate the relevant "obligation." This paragraph has one clear meaning: managers, not Rag-O-Rama, must work for a year or give back their benefits.

Hall next concedes that the Employee Handbook clarifies that Rag-O-Rama retains all employees on an at-will basis, but she argues that this handbook does not apply to executives like her. She cites language at the beginning of the handbook stating that it "summarizes Rag-O-Rama policies and procedures that affect all *non-executive* Rag-O-Rama employees." Emp. Handbook, R.52-5, PageID 504 (emphasis added). Yet the Employee Handbook elsewhere specifically describes her "Area Manager" position as an example of an employee covered by the handbook, *id.*, PageID 527, and unambiguously says that "*[a]ll* Rag-O-Rama employees are employed 'at will,'" *id.*, PageID 507 (emphasis added); it does not carve out her position from that relationship. The Manager Handbook likewise noted that it was subject to change "except to the Rag-O[-]Rama policy of employment at will." Man. Handbook, R., 53-13, PageID 679. And she agreed to "uphold all company policies as outlined in the Employee and Manager Handbooks" in her contract. Commc'n Form, R.52-1, PageID 487. Regardless, these handbooks are ultimately beside the point. When interpreted against Kentucky's background presumption of at-will employment, her written contract unambiguously left her as an at-will employee. *See Shah*, 655 S.W.2d at 492.

Hall lastly relies on *Hammond v. Heritage Communications, Inc.*, 756 S.W.2d 152 (Ky. Ct. App. 1988), to argue that Whitener's oral promises could modify the at-will relationship. She is correct on the legal point. *Hammond* relied on an oral promise to depart from the default presumption of an at-will relationship. *See id.* at 154. But this point does her no good. *Hammond*

9

did not involve a written contract. This case does. It thus triggers another background rule: We must interpret a clear written contract in accordance with its terms without using the parol evidence that Hall identifies. *See New Life Cleaners*, 292 S.W.3d at 322. Because the written contract unambiguously retains Hall's at-will status, she cannot fall back on oral promises to depart from that status.

One last point. An at-will relationship generally goes both ways: The employer can fire the employee at any time and the employee can quit at any time. *See Shah*, 655 S.W.2d at 491. Does it matter that Hall committed herself to one year of employment without obtaining an identical commitment from Rag-O-Rama? We do not see why. It is not even clear that this clause imposed a contractual duty on Hall that could be "breached" instead of a mere "condition" on Hall's ability to retain the benefits mentioned in the next sentence. *Cf. Infinity Cap. LLC v. Francis David Corp.*, 851 F. App'x 579, 584–85 (6th Cir. 2021). Even if it were a duty, it is not clear why one side of an employment relationship could not exchange the flexibility that comes with at-will employment for, say, better pay, while the other side retains the benefits of that at-will arrangement. *Cf.* Epstein, *supra*, at 963–73. Ultimately, though, we need not decide how this asymmetry should affect things. Hall did not raise the argument. Her contract claim thus fails because the contract unambiguously permitted Rag-O-Rama to fire her when it did.

### B. Fraudulent Misrepresentation

This conclusion leaves Hall's claim of fraud tied to Whitener's alleged oral promises. For this tort claim, too, the parties agree on several legal fronts. They agree that Kentucky tort law applies. They likewise do not dispute the elements of a fraudulent-misrepresentation claim, including that Whitener must have made a false representation and that Hall must have relied on it. *See Bear, Inc. v. Smith*, 303 S.W.3d 137, 142 (Ky. Ct. App. 2010) (citing *United Parcel Serv.*

10

*Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999)). And they agree that, to establish her claim, Hall must prove that her reliance on Whitener's alleged false representations was objectively "reasonable" or "justifiable." *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009) (quoting Restatement (Second) of Torts § 537 (Am. L. Inst. 1977)).

The parties diverge only over whether Hall acted *reasonably* by relying on Whitener's alleged promises. Hall claims that she took the area manager job only because Whitener promised that Rag-O-Rama would give her a car, a $5,000 payment for her design work, and a potential ownership interest in Rag-O-Rama. Rag-O-Rama responds that she could not have reasonably relied on these promises because they were not in the written contract. A jury typically should resolve this factual question over whether Hall's reliance was reasonable. *See Yung v. Grant Thornton, LLP*, 563 S.W.3d 22, 47 (Ky. 2018). As with any other factual question, though, we may rule for Rag-O-Rama as a matter of law if no reasonable jury could find Hall's reliance reasonable. *Id.* That is the case.

At the outset, it is not clear that Whitener made the kinds of statements that can establish a fraud claim in Kentucky. For a statement to be fraudulent, a defendant typically must lie about a *past* or *then-existing* fact. *See Crestwood Farm Bloodstock v. Everest Stables, Inc.*, 751 F.3d 434, 444 (6th Cir. 2014). If, for example, RadioShack attempted to convince a potential franchisee to open a store by claiming that a prior bankrupted franchisee had made a fortune, that lie about a past fact could suffice. *See RadioShack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256, 262–63 (Ky. Ct. App. 2007). Conversely, a statement about a *future* fact typically does not suffice. *See Crestwood*, 751 F.3d at 444. So RadioShack's further promise to supply the potential franchisee with its best inventory if the franchisee opened a store could not support a fraud claim "because the statement involved a promise of future performance." *RadioShack*, 222 S.W.3d at 262.

This rule perhaps arises out of the concern with turning every breach of contract (that is, every broken promise) into a fraud claim. *Cf. Extra Equipamentos E Exportacao Ltda. v. Case Corp.*, 541 F.3d 719, 724 (7th Cir. 2008). And here, Hall alleges only broken promises about future acts.

That said, Kentucky courts have created an exception to this rule for future promises that the promisor has no intention of carrying out. *See Bear*, 303 S.W.3d at 142 (citing *Major v. Christian Cnty. Livestock Mkt.*, 300 S.W.2d 246, 249 (Ky. 1957)). This exception comports with the cases that bar fraud claims based on future facts because the promisor impliedly lies about a *then-existing* fact: the promisor's intent to carry out a future action. *See* Restatement (Second) of Torts § 530(1) & cmt. c. Yet the Kentucky Supreme Court has called this exception "narrow," has required the promisor's statement to concern objectively verifiable future facts, and has held that "recipients of business representations" still have a "duty to exercise common sense." *Flegles*, 289 S.W.3d at 549. Hall attempts to invoke this exception here, claiming that Whitener had no intent to carry out any of his promises. We need not consider whether she presented enough evidence to establish a jury question over Whitener's intent because her claim fails on other grounds.

Kentucky courts have long held that a plaintiff cannot reasonably rely on a representation that a certain fact is true if the plaintiff could have readily discovered its falsity. *See Mayo Arcade Corp. v. Bonded Floors Co.*, 41 S.W.2d 1104, 1108 (Ky. 1931); *Wickman Constr., Inc. v. Duncan*, 2021 WL 1431618, at *7 (Ky. Ct. App. Apr. 16, 2021). For fraud claims between contracting parties, this rule bars one side of the bargain from alleging fraud based on the other side's oral promise if that promise contradicts the written agreement. *See Waldenmaier v. Fischer Single Fam. Homes, II, LLC*, 2012 WL 3538476, at *3 (Ky. Ct. App. Aug. 17, 2012); *Keith v. Robinson*, 2006 WL 3524056, at *3 (Ky. Ct. App. Dec. 8, 2006); *Rivermont Inn, Inc. v. Bass Hotels  Resorts,*

*Inc.*, 113 S.W.3d 636, 640–41 (Ky. Ct. App. 2003); *see also Bisig*, 940 F.3d at 211; *Davis v. Siemens Med. Sols. USA, Inc.*, 2007 WL 710133, at *3–4 (W.D. Ky. Mar. 6, 2007), *aff'd*, 279 F. App'x 378 (6th Cir. 2008) (per curiam). When an oral promise conflicts with a written contract, a plaintiff can easily discover that the promise is false simply by reading the contract. 37 Am. Jur. 2d Fraud & Deceit § 255, Westlaw (database updated Aug. 2021); *Mayo*, 41 S.W.2d at 1108. In this way, the reliance element sometimes prevents a contracting party from using a fraud claim merely to avoid the parol-evidence rule that would bar the party from introducing this oral evidence in a contract suit. *Cf. Extra Equipamentos*, 541 F.3d at 724. The element also establishes a clear rule for parties: ensure that oral promises comport with the written agreement. *Cf. Novia Commc'ns, LLC v. Weatherby*, __ F. App'x __, 2021 WL 3399827, at *9 (6th Cir. Aug. 4, 2021).

A few examples illustrate this reasonable-reliance principle in practice. Homeowners did not reasonably rely on a developer's oral assurance that their neighbor's garage would face away from their home because the purchase contract did not include this restriction. *See Waldenmaier*, 2012 WL 3538476, at *3. Similarly, a real-estate broker for a buyer of land did not reasonably rely on an oral assurance from the seller's broker that he would receive a 5% commission because the contract listed his commission as only 2.5%. *See Keith*, 2006 WL 3524056, at *3. And a sales executive did not reasonably rely on his employer's oral assurance that he would receive commissions on all sales because the contract granted him commissions on only those sales that he directly made. *See Davis*, 2007 WL 710133, at *4–5.

This logic applies here. Hall claims that she relied on Whitener's promises to give her a car, $5,000, and an ownership interest in Rag-O-Rama. Yet she asked for a written agreement before leaving her stable position with Elizabeth Cole so that she would have greater guarantees of what her new job provided. Resp., R.64-1, PageID 760. And she conceded that she did not

"insist[]" that this agreement include Whitener's promises. Hall Dep., R.52, PageID 338–39. At the same time, the contract delineated many other benefits that Rag-O-Rama promised. On top of her $51,000 annual salary, Rag-O-Rama agreed to give up to $3,600 in quarterly bonuses, $910.71 in paid time off, $5,211.84 in health insurance, and $1,025.66 for a cell phone. Commc'n Form, R.52-1, PageID 487. Given that the contract laid out Hall's benefits package in such detail (down to providing a phone worth much less than what she now claims she was promised), no reasonable person could believe that Rag-O-Rama also agreed to provide her $5,000 in cash and even a car. A healthy dose of "common sense" would suggest to the ordinary person that the agreement did not include these other things. *Flegles*, 289 S.W.3d at 549. And Hall's belief that she might receive them was nothing "more than a hope[.]" *Keith*, 2006 WL 3524056, at *3. Her reliance on Whitener's promises was unreasonable.

Hall responds that a written contract can make her reliance on an oral promise unreasonable only if a "direct contradiction" exists between the two. Appellant's Br. 16. She adds that the Communication Form did not contradict Whitener's promises because it said nothing about, say, a company car or a $5,000 payment. *Id.* Yet that is precisely the problem. The contract laid out Hall's benefits with precision and nowhere mentioned these other things. So a direct "conflict" exists between the written contract and the oral promises when we define the relevant question at the proper level of generality: What benefits would Hall receive if she took this job? *Rivermont*, 113 S.W.3d at 640. Indeed, this conflict is more "direct" than the one in *Bisig*. There, workers who were transitioning to Time Warner Cable during a buyout of their prior employer claimed that they relied on Time Warner Cable's promises that they would keep their jobs and receive better pay. 940 F.3d at 209. They had also acknowledged in writing, however, that they were at-will employees. *Id.* We found a conflict between the written at-will disclaimer and the oral promise

14

of continued employment and better pay because an employer can fire or change the pay of at-will employees at any time. *Id.* at 211–12. If that conflict sufficed, so does this one.

Hall suggests that this reasoning would effectively bar all fraud claims between contracting parties because those claims will always turn on oral statements outside the contract. Yet Kentucky courts have already cautioned that they allow fraud claims based on future promises only in "narrow" circumstances. *Flegles*, 289 S.W.3d at 549. And our holding does not eliminate such claims in this contract setting. It is not difficult to imagine false representations that would have been actionable in this case despite the parties' contract—for example, that another area manager at Rag-O-Rama had previously made a great deal of money, *cf. RadioShack*, 222 S.W.3d at 262–63, or that the company's finances were sound, *cf. Durbin v. Bank of Bluegrass & Tr. Co.*, 2006 WL 1510479, at *2 (Ky. Ct. App. June 2, 2006). These statements would not have conflicted with anything in the contract. The same cannot be said for the promised benefits that Hall seeks. Because a reasonable person would have expected to see them in that contract (next to all the other benefits), Hall could not have reasonably relied on Whitener's promises.

Hall next distinguishes *Rivermont* and *Bisig* because those cases involved noncontractual written disclaimers that the plaintiffs signed *before* the oral promises, whereas this case involves a written contract that Hall entered into *after* the oral promises. *See Bisig*, 940 F.3d at 211 (quoting *Rivermont*, 113 S.W.3d at 640). We fail to see why this distinction matters. Kentucky courts have extended the same reasonable-reliance rule to this scenario. *See Waldenmaier*, 2012 WL 3538476, at *3. If anything, the existence of a written contract makes the case against reliance stronger. This fact pattern more closely fits the general rule that the reliance element "is precluded when oral representations are not contained in a separate written agreement[.]" 37 Am. Jur. 2d Fraud & Deceit § 255; *see Mayo*, 41 S.W.2d at 1109.

Hall's remaining two cases do her no good. *See Rickert*, 996 S.W.2d at 467–69; *PCR Contractors, Inc., v. Danial*, 354 S.W.3d 610, 616 (Ky. Ct. App. 2011). In *PCR Contractors*, the defendant orally promised to guarantee the contractual duty of a company that he owned, and the plaintiff entered into a contract with that company that expressly identified this guarantee. 354 S.W.3d at 611–12, 615. Unlike in this case, therefore, a written contract reaffirmed (it did not undermine) the oral promise. *Rickert* is similarly unhelpful to Hall. There, the Kentucky Supreme Court found that a pilot had reasonably relied on UPS's oral promise to hire him after it decided to stop contracting with the pilot's then-employer. 996 S.W.2d at 467. Unlike Hall, however, the pilot did not enter into a written contract with UPS, let alone one that conflicted with UPS's promise. *See id.* at 469. Because that conflict exists in this case, Hall's reliance on Whitener's oral promises was unreasonable.

## III. Rag-O-Rama's Cross-Appeal

Rag-O-Rama cross-appeals the district court's denial of its motion for attorney's fees. We review the court's decision for an abuse of discretion. *See Rentz v. Dynasty Apparel Indus., Inc.*, 556 F.3d 389, 395 (6th Cir. 2009). Under that ubiquitous standard, we may reverse only if the court committed a legal error, made a clearly mistaken finding of fact, or left us with a firm conviction that it exercised its discretionary authority improperly. *See Gibson v. Solideal USA, Inc.*, 489 F. App'x 24, 28 (6th Cir. 2012). The court's decision in this case did none of those things.

The so-called "American Rule" generally requires litigants to pay their own attorneys. *See id.* at 29. But this principle contains several exceptions. Rag-O-Rama relies on exceptions in a rule, in a statute, and in an implied power. The rule: Rule 11 allows a court to require an attorney to pay the other side's attorney's fees if the attorney makes arguments that are legally frivolous or

factually baseless. *See* Fed. R. Civ. P. 11(b)(2)–(3), (c)(4); *Rentz*, 556 F.3d at 395. The statute: Section 1927 of Title 28 permits a court to compel an attorney to pay the fees of another party if the attorney "multiplies the proceedings . . . unreasonably and vexatiously" (whether or not the attorney acted in bad faith). 28 U.S.C. § 1927; *see Rentz*, 556 F.3d at 395–96. The judicial power: A court's inherent authority allows it to require a litigant to pay the other side's fees as a sanction for an abuse of the judicial process, but the court may do so only if the litigant acted in bad faith and only to compensate the victim of the abuse (not to punish the wrongdoer). *See Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186–88 (2017); *Runfola & Assocs., Inc. v. Spectrum Reporting II, Inc.*, 88 F.3d 368, 375 (6th Cir. 1996).

We see no basis to disturb the district court's decision not to sanction Hall under these standards. As an initial matter, the court properly recited the governing legal principles that apply to Rule 11, § 1927, and the court's inherent power. *See Hall*, 2020 WL 4741911, at *5–6. Next, the court made no clearly wrong factual findings. It found, for example, that Hall had not acted in bad faith, which eliminated any ability to award sanctions under the court's inherent authority. *Id.* at *6; *see Runfola*, 88 F.3d at 375. Rag-O-Rama identifies no contrary evidence other than the purported weakness of Hall's claims. Yet the district court had firsthand experience with the litigation and litigants, so it was better situated to judge whether Hall pursued those clams in a genuine attempt to recover or to harass Rag-O-Rama. *See Simonoff v. Saghafi*, 786 F. App'x 582, 584–85 (6th Cir. 2019). Lastly, the court acted within its "wide discretion" when finding that Hall's claims—in particular, the breach-of-contract and fraud claims—were not frivolous. *Id.* at 584; *see Hall*, 2020 WL 4741911, at *5. Although we have rejected those claims, the poorly written contract gave Hall a legitimate basis for her contract theory. And Whitener's alleged oral promises (which Hall testified to under oath) did the same for her fraud theory.

In response, Rag-O-Rama concedes that the district court reasonably held that Hall's contract and fraud claims were proper. The company instead methodically relitigates all of Hall's other legal theories, which ranged from breach of warranty to intentional infliction of emotional distress. Rag-O-Rama asserts that the district court abused its discretion because it rejected these theories on the merits while failing to find them frivolous. But not every loss at the summary-judgment stage warrants sanctions. *See Gibson*, 489 F. App'x at 32. That result would flip the American Rule on its head in this day of rare trials.

Rag-O-Rama also argues that the district court had a duty to explain in a written opinion why each of these claims was not frivolous—on a claim-by-claim basis. Not so. When denying sanctions, busy district courts need not write "exhaustive opinions" to avoid the abuse-of-discretion label. *United States v. Keefer*, 832 F. App'x 359, 363 (6th Cir. 2020); *see Gibson*, 489 F. App'x at 32. We also find the court's reasoning clear. These other claims did not, for example, unnecessarily "multipl[y] the proceedings" because they overlapped with the two claims that Rag-O-Rama does not challenge (and so this case's factual development would have been the same with or without them). 28 U.S.C. § 1927. And if these other claims were as frivolous as Rag-O-Rama alleges, it could have filed a motion to dismiss them at the pleading stage. *See Gibson*, 489 F. App'x at 30. But it did not. *See Hall*, 2020 WL 4741911, at *5 n.4.

We affirm.